UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

JANE DOE,

Plaintiff,

v.

NORTHEASTERN UNIVERSITY;

MADELEINE ESTABROOK, Senior Vice Chancellor for Student Life, Northeastern University, in her individual capacity;

KYLE DROZ, Director of Disability Access Services, Northeastern University, in his individual capacity;

CHRIS MALLETT, Chief Administrative Officer, Roux Institute, Northeastern University, in his individual capacity;

ANNIE CHUPREVICH, Senior Director of Student Life, Roux Institute, Northeastern University, in her individual capacity;

LIZ ATWOOD, Director of Finance, Roux Institute, Northeastern University, in her individual capacity;

JOHN LITTLE, former Assistant Director of Financial Aid, Roux Institute, Northeastern University, in his individual capacity;

DEANNA BARRY, Associate Director of Housing, Roux Institute, Northeastern University, in her individual capacity;

MOLLY DOMINO, Lecturer, Northeastern University, in her individual capacity;

MICHAELA GILL, Academic Advisor, Roux Institute, Northeastern University, in her individual capacity;

SAMANTHA O'NEIL SANFILIPPO, Administrator, Office of Student Conduct and Conflict Resolution, Northeastern University, in her individual capacity;

DANIELLE McGRATH, Director, Office of Student Conduct and Conflict Resolution, Northeastern University, in her individual capacity;

NHR II MASTER TENANT LLC, a limited liability company;

REDFERN PROPERTIES LLC, a property management company;

AMBER DORCUS, Director of Property Management, Redfern Properties in her individual capacity,

Defendants.

Civil Action No. ____________

COMPLAINT FOR VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT, THE AMERICANS WITH DISABILITIES ACT, THE FAIR HOUSING ACT, BREACH OF CONTRACT, NEGLIGENCE, FRAUD AND FRAUDULENT MISREPRESENTATION, DEFAMATION, CONVERSION, INVASION OF PRIVACY, INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, INTERFERENCE WITH CONTRACTUAL RELATIONS, INSURANCE-CLAIM SUPPRESSION, CIVIL CONSPIRACY, AND RELATED CLAIMS

DEMAND FOR JURY TRIAL

Filed Under Pseudonym

Motion to Proceed as Jane Doe and for Limited Sealing/Redaction Filed Concurrently

## I. PRELIMINARY STATEMENT

1. This action arises from a coordinated institutional scheme, sustained financial misconduct, systematic concealment, manufactured chain of harm, retaliation and removal executed for more than two years by Northeastern University, its property management vendor Redfern Properties LLC, and individual Defendants acting within their institutional authority, to avoid financial and legal accountability for a traumatic brain injury caused by Northeastern's own conduct and to suppress the evidence, the witnesses, and the legal claims that would have established that accountability.

2. The pattern began on January 8, 2024, when Northeastern certified scholarship funding on Plaintiff's federal immigration documents, including a loan and the Alfond Scholarship award, that were not disbursed for 270 days. Northeastern is the federally certified sponsor of Plaintiff's immigration status and the Title IV administrator of her financial aid. That certification was false from the beginning, yet it was transmitted to the Department of Homeland Security through federal systems and certified on four successive immigration documents through March 2026. To date, the Alfond Scholarship has not been disbursed.

3. Financial coercion reinforced the deprivation that resulted in a brain injury. A finance officer pressured Plaintiff to make false financial declarations to secure additional external funding designed to manufacture a record of her culpability for a funding crisis Northeastern created. Plaintiff refused to falsify records. The finance officer responded by sending her file to collections. Eventually, Northeastern paid $27,000 to reverse the fraudulent charges, confirming institutional responsibility for the improper billing. Throughout, it induced Plaintiff to remain enrolled and dependent on Northeastern's institutional support while prohibited by federal law from working.

4. The 270-day financial deprivation produced laboratory-confirmed iron-deficiency anemia. Plaintiff's treating hematologist documented systemic physiological depletion requiring intravenous iron therapy. Plaintiff's treating integrative medicine physician confirmed in writing that this depletion materially prolonged post-concussive recovery. Plaintiff's treating neurologist documented ongoing post-concussive sequelae confirmed by MRI imaging showing bilateral frontal encephalomalacia, structural brain changes that are objective, permanent and imaging verified. A separate neuropsychological evaluation ordered by Plaintiff's treating neurologist established measurable deficits in processing speed, memory, executive function, and attention. Five independent clinical disciplines. One continuous institutional cause.

5. When the injury that deprivation produced became a liability, the scheme pivoted from financial fraud to concealment of liability. Northeastern had assigned housing it knew violated municipal habitability standards and that exacerbated Plaintiff's deteriorating health, then billed for that housing across sixteen months. It suppressed the insurance claim arising from the injury for more than twelve months while continuing to collect premiums. It denied medically prescribed housing accommodations designed to stabilize Plaintiff's neurological recovery - each denial forcing Plaintiff to remain in the housing where the injury occurred and where the conditions that caused it remained unaddressed.

6. Academic obstruction ran parallel to the financial deception. Northeastern had assigned an unqualified instructor who refused to grade Plaintiff's work and told her to prepare to fail six weeks before the end of a term. When its own legal office received written notice, it preserved the grade and issued $14,000 through a mechanism not described in any student handbook, financial aid materials, or publicly available institutional documentation for repeat-course funding to bury the consequences of the negligence it declined to investigate. The repeat-course

entry created a false record: Plaintiff was academically deficient and Northeastern was providing remedial support. The truth was the opposite. Northeastern had assigned an instructor it knew was unqualified, allowed that instructor to sabotage Plaintiff's academic standing, and prioritized containing its exposure to make the misconduct disappear.

7. Northeastern then manufactured a false institutional narrative to justify the baseless removal it had already decided to execute. It fabricated disciplinary proceedings characterizing Plaintiff as dangerous rather than disabled, watched them collapse under its own scrutiny, yet maintained the resulting sanctions to block her registration, obstruct her thesis progression, and delay her graduation. The record it created served a single purpose: to obscure the fact that Plaintiff was not a threat to others but a victim of institutional conduct Northeastern had spent two years concealing. It collected every dollar Plaintiff paid. It kept them. Plaintiff seeks, as part of the relief requested in this action, an order requiring Northeastern to expunge that record and correct the institutional narrative it preserved, because the record does not reflect what Northeastern's own adjudicator found. This is an institution that is maintaining a false instrument. Through all of it, Northeastern never failed to collect tuition, housing payments, mandatory insurance premiums, and student services fees, each payment made by Plaintiff for a defined obligation it assumed and systematically breached.

8. Having exhausted the institutional levers available to it, Northeastern coordinated with Redfern Properties LLC - a professional property management company with more than twelve months of actual disability knowledge - to execute a physical illegal eviction without judicial process, during an active municipal Code Enforcement investigation of the housing conditions that contributed to the injury, removing Plaintiff from the premises before that investigation could be completed. It cut her heat. It entered her home. It removed her medications. It executed an illegal eviction in winter while a court hearing was pending, coordinating with Redfern to

complete the removal before judicial review could occur. Each act was a choice. Each choice had a name attached to it.

9. Each step in this sequence served the same institutional purpose. Northeastern sought to create maximum pressure on an international student who arrived whole, sustained a traumatic brain injury under its institutional custody, and was now disabled, financially depleted, and legally trapped - pressure sufficient to make her abandon her claims before the full evidentiary record could be established. It sought to create false records that would obscure institutional liability. And it sought to remove from the premises the primary witness to the conditions that caused the injury it had spent two years concealing. Every outcome was the product of institutional decisions made by named administrators with knowledge, authority, and a documented choice. This action enforces the obligations Northeastern assumed and violated.

10. Plaintiff brings this action to establish the full scope of Defendants' coordinated misconduct, to recover all damages caused by that misconduct, and to ensure that the institutional actors responsible for each step in this scheme are held individually accountable for their knowing participation in it.

11. Plaintiff seeks the full measure of relief this Court has authority to grant. She seeks compensatory damages for every economic and noneconomic loss Defendants' conduct caused. She seeks punitive damages where the law permits, to punish conduct that was not accidental but orchestrated - by Northeastern, and by Redfern Properties LLC, the professional property manager that chose commercial loyalty over legal obligation. She seeks declaratory relief establishing that Defendants' actions constitute disability-based discrimination, retaliatory housing action, and systematic deprivation of federally protected civil rights. She seeks equitable relief correcting the falsified records, expunging the fabricated disciplinary findings, and

restoring what Defendants' coordinated scheme was designed to destroy. She seeks such other relief as justice requires.

12. Plaintiff brings federal claims under Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act, and the Fair Housing Act. She brings state claims for breach of contract, fraudulent misrepresentation, negligence, coercion, conversion, invasion of privacy, defamation, intentional and negligent infliction of emotional distress, and civil conspiracy. Both Northeastern University and Redfern Properties LLC are named as Defendants. Individual administrators are named in their personal capacity for the choices they made and the harm those choices caused. This Complaint is filed with full reservation of all legal rights and remedies, including the right to seek leave to amend as additional facts emerge in discovery.

## II. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Federal question jurisdiction exists over Plaintiff's claims arising under Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act, and the Fair Housing Act. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiff's related Maine state-law claims - including her claims for illegal self-help eviction, trespass, conversion, negligence, breach of contract, fraud and fraudulent misrepresentation, defamation, invasion of privacy, intentional and negligent infliction of emotional distress, interference with contractual relations, and insurance-claim suppression - because they arise from the same case or controversy as her federal civil-rights claims. The January 12- 14, 2026 eviction was the culminating act of the same continuous course of scholarship misconduct, insurance suppression, fabricated disciplinary

proceedings, and disability-based retaliation that forms the basis of Plaintiff's federal claims, and is therefore properly adjudicated together with them.

14. This Court has personal jurisdiction over all Defendants. Northeastern University operates the Roux Institute in Portland, Maine - a named physical institution with resident faculty, staff, and students - and employs personnel whose duties over housing, finance, disability services, academic advising, and student conduct were exercised within this District against this Plaintiff. Certain Defendants reside and work in Maine. Others are based in Boston but exercised supervisory and decision-making authority directed specifically at Plaintiff's housing, funding, accommodations, and disciplinary status at the Roux Institute, with foreseeable and actual consequences in Maine. Plaintiff's injuries were suffered here. Jurisdiction over all Defendants comports with Maine's long-arm statute and the Due Process Clause.

15. Northeastern University received approximately $268 million in federal financial assistance in fiscal year 2024. That funding subjects it to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the full scope of federal civil rights obligations that attach to it. Northeastern also participates in Title IV of the Higher Education Act and holds SEVP certification under 8 C.F.R. § 214.3 - certifications that imposed specific, non-delegable administrative duties toward Plaintiff as an F-1 student and financial aid recipient. Plaintiff does not assert standalone causes of action under SEVP regulations or FERPA. Northeastern's deliberate violations of 8 C.F.R. § 214.3 and 20 U.S.C. § 1232g establish the institutional standard of care applicable to Plaintiff's state-law claims for negligence, fraud, and invasion of privacy, and constitute aggravating conduct supporting punitive damages across all counts.

16. Plaintiff does not assert claims for educational malpractice and does not ask this Court to second-guess the academic discretion of Northeastern University. Plaintiff seeks to enforce

specific, objective, and documented contractual promises - including the disbursement of certified financial aid, the provision of habitable housing, and the processing of a designated insurance claim - and challenges Defendants' retaliatory deployment of academic, disciplinary, and housing processes against a disabled student who asserted her legal rights.

17. The failing grade issued to Plaintiff was not the product of academic evaluation. It was a documented retaliatory act, evidenced by Defendant Domino instructing Plaintiff to prepare to fail six weeks before the term's end, before her submitted coursework was assessed. That is not academic discretion. That is institutional concealment of retaliation, and it sounds in breach of contract, negligence, and fraud.

18. Redfern Properties LLC acted at all relevant times as the agent, representative, and joint enterpriser of Northeastern University in the management and enforcement of student housing at 144 State Street, Portland, Maine. Northeastern exercised direct control over student housing assignments, collected housing fees directly from Plaintiff, and directed Redfern's participation in the January 2026 lockout and property removal. Redfern was not an independent contractor whose conduct was insulated from Northeastern's liability, but an entity through which Northeastern implemented and enforced its student housing policies at 144 State Street. Northeastern is vicariously liable for Redfern's acts within the scope of that agency relationship, and both entities are independently liable for their coordinated participation in the retaliatory eviction.

19. Venue is proper in this District under 28 U.S.C. § 1391(b). Plaintiff resided, studied, and was injured at 144 State Street, Unit 518, Portland, Maine - the housing Northeastern assigned, managed, billed for across sixteen months, and from which it executed an extrajudicial eviction

in January 2026. Every individual Defendant exercised administrative authority over Plaintiff's housing, funding, and academic standing within this District.

20. All claims are timely. They arise from a continuing course of conduct that began January 8, 2024, when Northeastern transmitted a false scholarship certification through federal immigration systems, and extended without interruption through January 2026. Under the continuing violation doctrine, the limitations period runs from the last act in that continuous pattern. Specific limitations periods applicable to Plaintiff's claims include: (a) Maine's six-year statute, 14 M.R.S. § 752, governs Plaintiff's federal civil rights claims, her contract claims, and her general tort claims including negligence, trespass, conversion, IIED, and NIED; (b) Plaintiff's defamation claims are governed by the two-year statute under 14 M.R.S. § 753 and are timely; (c) Plaintiff's fraud claims run from discovery under 14 M.R.S. § 752-A - each fraud claim accrued when Plaintiff discovered, or reasonably could have discovered, the fraudulent conduct alleged, no earlier than August 2024 for the scholarship and financial fraud, and extending through the date of filing for the SEVIS certifications and insurance suppression, both of which were ongoing and actively concealed throughout.

21. Three independent grounds for tolling apply. First, the continuing violation doctrine extends the period to the last act in the related pattern, which occurred in January 2026. Second, Defendants' active concealment - including false certifications on successive federal immigration documents, suppression of an assigned insurance claim, and maintenance of a fabricated disciplinary record their own appellate officer documented as factually inaccurate - tolls the period for each concealed claim. Third, Plaintiff's traumatic brain injury, sustained December 2, 2024, produced documented cognitive limitations that materially impaired her ability to investigate and pursue legal claims throughout a period of active neurological

treatment under an institutionally approved reduced course load, tolling that independently applies through the date of filing.

22. Plaintiff has exhausted all available internal administrative remedies. Defendants responded with continued retaliation: post-exoneration disciplinary sanctions, registration interference, and a physical extrajudicial eviction executed while a court hearing was pending. In addition to this civil action, Plaintiff is filing related administrative complaints with state and federal agencies arising from the same course of conduct. Those proceedings focus on regulatory oversight and systemic issues and are not designed to provide the full, case-specific relief available in federal court. Plaintiff therefore brings this action to obtain the judicial remedies that only this Court can provide in her individual case.

## III. PARTIES

23. Plaintiff Jane Doe is an international graduate student who was competitively selected for a named merit scholarship on the basis of academic and professional credentials Northeastern verified, reviewed and approved prior to admission. She brings more than a decade of international experience shaping law, policy, and security frameworks for global audiences. She often serves as a judge in international competitions and contributes to the bodies that govern emerging technology and human rights. She was admitted to the Roux Institute's Align programme on the strength of that record and on the basis of demonstrated capacity for independent creation and distribution of knowledge, including developing intellectual property she brought to the institution. She arrived in the United States in good faith, enrolled in reliance on Northeastern's representations, and remains enrolled as an F-1 nonimmigrant student in good academic standing whose immigration status is sponsored by the institution whose conduct this Complaint describes.

24. Defendant Northeastern University is a private institution of higher education incorporated in Massachusetts with a reported annual revenue of $2.5 billion, and operates the Roux Institute in Portland, Maine. Northeastern received approximately $268 million in federal financial assistance in fiscal year 2024, subjecting it to Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act, the Fair Housing Act, and related federal civil rights statutes as conditions of that funding. Northeastern participates in Title IV federal student aid programmes and is certified by the Student and Exchange Visitor Program (SEVP) under 8 C.F.R. § 214.3 to sponsor F-1 students. Northeastern is vicariously liable for the acts and omissions of its employees acting within the scope of their employment and institutional authority.

25. Defendant Madeleine Estabrook is Senior Vice Chancellor for Student Life at Northeastern University. At all relevant times, Estabrook held senior institutional authority over Northeastern's disability accommodation, housing enforcement, and student conduct systems—the three mechanisms deployed in coordinated sequence against Plaintiff after she documented her disability and asserted her legal rights. Estabrook received written notice of each category of violation alleged in this Complaint, including formal demands that she intervene to prevent the January 2026 extrajudicial eviction, and she did not intervene. On January 15, 2026—three days after Northeastern's illegal entry into Plaintiff's residence—Estabrook sent Plaintiff a written communication expressly rejecting the applicability of disability law by name while acknowledging Plaintiff's documented medical needs. Plaintiff's disciplinary matter was the subject of a written directive from a Vice Chancellor ordering reassignment due to serious defects in the underlying decision. That directive was disregarded, the registration block remained in place, and no one within the Office of Student Conduct and Conflict Resolution was disciplined or overruled, even though that office ultimately reported to

Estabrook. As the senior institutional officer with supervisory authority over every system through which Plaintiff was harmed, and as the officer who received written notice and chose not to act, Estabrook authorized and ratified the conduct of the Northeastern Defendants named herein. She is sued in her individual capacity.

26. Defendant Chris Mallett is Chief Administrative Officer of the Roux Institute. At all relevant times, Mallett held operational authority over all Roux Institute functions in Maine, including vendor partnerships, property management, student housing compliance and administrative operations affecting Plaintiff. Mallett received written notice of the 270-day scholarship and loan nondisbursement and authorized a $27,000 credit to Plaintiff's account as an institutional acknowledgment of wrongful billing. He also received written notice of academic misconduct affecting Plaintiff and declined to intervene. He bore ultimate supervisory responsibility over the non-compliant housing unit in which Plaintiff sustained her traumatic brain injury, the denial of medically prescribed disability accommodations, the suppression of the resulting insurance claim, the retaliatory conduct that followed, and the January 2026 extrajudicial eviction. He is sued in his individual capacity.

27. Defendant Annie Chuprevich is Senior Director of Student Life and Director of Student Housing at the Roux Institute. At all relevant times, she exercised primary authority over the non-academic student experience, including housing, financial and disability-related issues, student wellbeing and safety, and crisis responses affecting Roux Institute students, including Plaintiff. The 270-day scholarship nondisbursement and its consequences unfolded under her direct administrative oversight. She failed to remedy the deprivation, misrepresented Plaintiff's account and collections activity, assigned Plaintiff to a non-compliant unit and refused to remedy or transfer her from it, and reversed housing disability accommodations she had previously granted. She also initiated, supported, and fabricated disciplinary proceedings, and

personally participated in the January 2026 self-help eviction on multiple filmed occasions, including trespassing into Plaintiff's unit and handling her belongings without judicial process. She is sued in her individual capacity.

28. Defendant Kyle Droz is Director of Disability Access Services at Northeastern University. At all relevant times, Droz held authority over disability accommodation intake, evaluation, and determinations for students, including Plaintiff. Across three consecutive terms, he received complete clinical documentation from Plaintiff's treating neurologist and other licensed providers and still failed to implement the full scope of prescribed accommodations. He manufactured procedural obstacles that reset processing timelines, delayed decisions until academic and financial deadlines made noncompliance costly,and then issued only partial and time-limited approvals that contradicted the one-year medical plan. He denied medically necessary housing on a technicality of his own invention, relying on enrolment coding and the absence of the words "Roux housing" in the neurologist's letter despite identical documentation having previously supported the same housing. He paraphrased and disclosed Plaintiff's medical information to non-DAS administrators without authorization. He suggested that Plaintiff solve her housing need by returning to the campus where her head injury occurred. He is sued in his individual capacity.

29. Defendant Liz Atwood is the director of enrollment at the Roux Institute. At all relevant times, Atwood held supervisory authority over recruitment, financial aid, and enrollment operations, including all financial aid communications and disbursements affecting Plaintiff. She was personally present during the meeting in which Plaintiff was coerced to sign false financial attestations to secure additional loan funds while scholarship funds certified on Plaintiff's federal immigration documents remained undisbursed, and was copied on all related written communications. The accusation that Plaintiff had entered the United States illegally - imputing

a federal felony to a student whose visa Northeastern had itself recruited, certified, and sponsored - was made in her presence and within her authority to stop or correct it. She did not stop it. She is sued in her individual capacity.

30. Defendant John Little is a former Assistant Director of Financial Aid at the Roux Institute, currently employed at Collins Automation. At all relevant times, Little operated under Atwood's supervisory authority and direct oversight. He coerced Plaintiff to sign false financial attestations to secure another loan while scholarship funds certified on Plaintiff's federal immigration documents remained undisbursed. Little accused Plaintiff of having entered the United States illegally - implying Plaintiff had committed a felony against the Department of Homeland Security - when Northeastern University had itself recruited Plaintiff, certified her immigration documents, and sponsored her F-1 visa. He is sued in his individual capacity.

31. Defendant Molly Domino is a Lecturer at Northeastern University who, at the time of the conduct alleged herein, lacked the doctoral credentials ordinarily required to teach at the graduate level. Approximately six weeks before the end of the Spring 2024 term, in the presence of Plaintiff's academic advisor, Defendant Michaela Gill, Domino told Plaintiff to "prepare to fail" before Plaintiff's submitted coursework had been assessed. Domino then refused to grade that work and issued a failing outcome, while Plaintiff passed another graduate course in the same term. Northeastern's Office of General Counsel and Defendant Mallett each received written notice of Domino's conduct and took no remedial action. As a direct result of Domino's refusal to grade, Plaintiff was required to retake courses she had already completed, lost two academic terms of normal progression, and suffered compounded delay on top of the existing 270-day funding obstruction and the effects of her traumatic brain injury. Domino is sued in her individual capacity.

Defendant Michaela Gill served as Plaintiff's academic advisor at the Roux Institute. Gill was present when Defendant Domino told Plaintiff to "prepare to fail" approximately six weeks before the end of the Spring 2024 term. Gill filed no report, made no intervention on Plaintiff's behalf, and took no remedial action. Instead of advocating for correction of the failing grade, she directed Plaintiff to prepare to retake courses she had already completed. Northeastern subsequently issued approximately $14,000 in additional funding that Plaintiff was not required to pay back through a mechanism not described in any student handbook, financial-aid materials, or publicly available institutional documentation. That mechanism did not correct the failing grade or the underlying misconduct. It created a hidden financial layer and a false institutional record of academic deficiency while leaving the grading abuse unremedied. By failing to challenge Domino's misconduct and steering the situation into hidden repeat funding and unnecessary repeats, Gill helped convert a grading abuse into the loss of two academic terms and concealed the underlying wrongdoing rather than remedy it. Gill is sued in her individual capacity.

32. Defendant Deanna Barry is Associate Director of Housing at the Roux Institute. At all relevant times, Barry exercised authority over housing oversight and enforcement actions affecting Plaintiff. Acting in coordination with Defendant Chuprevich, Barry received surveillance photographs of Plaintiff's belongings and pre-arranged a complainant's housing transfer ten days before any incident was reported. She then transmitted a narrative to internal university authorities, law enforcement, and Redfern Properties characterising Plaintiff as dangerous and armed. She did this while simultaneously holding photographs and medical documentation proving Plaintiff's physical incapacity following a traumatic brain injury sustained in university housing. She unlawfully disclosed Plaintiff's protected educational and medical records to third parties without consent. After the original complainant formally withdrew, Barry deliberately mischaracterised Plaintiff's legally protected correspondence as a "threat" to trigger retaliatory

disciplinary proceedings and manufacture institutional grounds for expulsion from the programme. Finally, Barry coordinated and directed the self-help eviction of Plaintiff without a court order. She is sued in her individual capacity.

33. Defendant Samantha O'Neil SanFilippo is an administrator in Northeastern's Office of Student Conduct and Conflict Resolution. At all relevant times, O'Neil SanFilippo consolidated investigative, adjudicatory, and appellate functions in herself, serving simultaneously as investigator, sole adjudicator, self-declared board, and signatory on the denial of the appeal of her own decision. She initiated and maintained charges for which she produced a finding of not responsible on every serious allegation. She violated Plaintiff's due process rights by denying effective representation, manufacturing procedural deadlines to foreclose appeal, and proceeding in deliberate disregard of Plaintiff's documented neurological disability and medical directives. Despite collapsing her own case against Plaintiff, she imposed a post-exoneration sanction that functioned as a registration block, which Plaintiff was compelled to satisfy under documented coercion and protest. She is sued in her individual capacity.

34. Defendant Danielle McGrath is the director of Northeastern's Office of Student Conduct and Conflict Resolution and O'Neil SanFilippo's direct supervisor. At all relevant times, McGrath exercised supervisory and appellate authority over disciplinary matters affecting Plaintiff. McGrath ratified and maintained the post-exoneration registration block in defiance of a written directive from university leadership to reassign the matter. She denied Plaintiff's appeal as untimely on a deadline McGrath herself had shortened after denying Plaintiff's disability accommodation request—violating Plaintiff's due process rights and ADA and Section 504 obligations by manufacturing the procedural defect she then wielded as the grounds for foreclosing review. That McGrath defied a written directive from a Vice Chancellor without institutional consequence is itself evidence that her conduct was authorized or ratified by a

superior authority. Defendant Estabrook, as Senior Vice Chancellor for Student Life and the official to whom OSCCR ultimately reported, held the institutional rank to authorize McGrath's defiance and the record reflects no consequence for it. She is sued in her individual capacity.

35. Defendant Amber Dorcus is Director of Property Management at Redfern Properties LLC and the senior Redfern official with direct operational authority over residential management, access control, utility systems, and enforcement actions at 144 State Street. Dorcus possessed actual notice of Plaintiff's disability for more than twelve months. Despite having no direct contractual relationship with Plaintiff, she issued Plaintiff a notice to vacate on December 18, 2025, acting as Northeastern's enforcement instrument without independent legal standing to do so. She directed unauthorized entries into Plaintiff's residence without notice or consent. She authorized the deliberate deprivation of heat to Plaintiff's unit for six consecutive days during a Maine winter while Plaintiff was under active neurological treatment. She then transmitted materially false statements to Portland Code Enforcement on two separate occasions denying that deprivation, establishing that the shutoff was deliberate and that her written submissions to a government authority were knowingly false in violation of Maine Title 17-A § 354. Plaintiff documented this concealment pattern in real time and placed it on the municipal record. Acting in coordination with Defendant Chuprevich, she personally appeared at Plaintiff's residence on January 12, 2026, physically obstructed Plaintiff from closing her own door while Plaintiff was on the phone with Portland Police, and stated on recorded audio that the illegal eviction she was executing was "not an eviction", all of which Plaintiff filmed. She then authorized the remote deactivation of Plaintiff's key-fob access, leaving Plaintiff locked out overnight without access to her prescription medications upon returning from class. She participated in and authorized the January 14, 2026 extrajudicial removal of Plaintiff's property, including prescription medications, without a court order, while the Code Enforcement investigation remained open and unresolved. She is sued in her individual capacity.

36. Defendant Redfern Properties LLC is a property management company exercising day-to-day operational authority over 144 State Street. Redfern had no direct contractual relationship with Plaintiff, yet acted as Northeastern's enforcement instrument to issue a notice to vacate without independent legal standing. With more than twelve months of actual knowledge of Plaintiff's disability, bolstered by Defendant Barry's unlawful disclosure of Plaintiff's protected educational and medical records to Redfern personnel, Redfern executed remote key-fob deactivations synchronized with Northeastern's physical entries on January 12 and January 13, 2026, the second of which left Plaintiff locked out overnight without access to her traumatic brain injury medications. Redfern directed unauthorized entries following Plaintiff's protected reports to municipal authorities on every occasion without exception, transmitted false statements to Portland Code Enforcement to conceal deliberate utility deprivation, and engaged in active concealment of habitability violations from municipal investigators by temporarily altering conditions following advance notice. Redfern participated in the extrajudicial removal of Plaintiff's property, including prescription medications, without a court order while simultaneously executing the eviction of the complaining tenant during an active Code Enforcement investigation, eliminating both the witness and municipal access to the premises. Redfern is sued as a corporate entity for its role in civil conspiracy, housing discrimination, retaliatory eviction, active concealment of habitability violations from municipal authorities, utility deprivation, unauthorized entry, intentional interference with medical treatment, unjust enrichment, and conversion.

37. Defendant NHR II Master Tenant LLC is the master leaseholder at 144 State Street, with ultimate authority over occupancy terms, habitability standards, and residential operations. As master tenant, NHR II bore primary responsibility for the habitability of the premises leased to Northeastern for residential student use, including Plaintiff's assignment to an uninhabitable

windowless room lacking mandatory glazing and ventilation. With actual knowledge of Plaintiff's disability, her neurologist's prescription against relocation, and an active municipal habitability investigation, NHR II acted in concert with Northeastern, Redfern, and individual Defendants to ratify and participate in the denial of Plaintiff's accommodations, the deliberate deprivation of essential utilities during a Maine winter, a pattern of retaliatory unauthorized entries, and the active concealment of habitability violations from Portland Code Enforcement, while continuing to collect rent through Northeastern with full knowledge of all of the foregoing. The January 2026 extrajudicial lockout and property removal were executed while the Code Enforcement investigation remained open and unresolved, neutralizing both the complaining tenant and municipal access to the premises simultaneously. NHR II's actual knowledge of the coordinated conduct executed on its property and its failure to prevent it gives rise to liability under 42 U.S.C. § 1986 in addition to its direct participation in the underlying violations. NHR II is sued as a corporate entity for its role in civil conspiracy, housing discrimination, retaliatory eviction, active concealment of habitability violations from municipal authorities, utility deprivation, intentional interference with medical treatment, unjust enrichment, and conversion.

38. At all relevant times, each individual Northeastern Defendant (collectively, the "Northeastern Defendants") acted within the scope of their employment and under the authority of Northeastern's institutional policies and practices. Each had knowledge of material aspects of Plaintiff's circumstances, authority to intervene, and a documented choice not to do so. Where individual Defendants exceeded their authority, Northeastern's failure to discipline, correct, or remedy their conduct constitutes ratification. Northeastern University is responsible for their acts and omissions under principles of respondeat superior and agency, and is independently liable for the policies, practices, and deliberate indifference that caused and ratified the violations alleged herein.

39. At all relevant times, Defendants Amber and other Redfern personnel (collectively, the "Redfern Defendants") acted within the scope of their employment and under the authority of Redfern Properties LLC and NHR II Master Tenant LLC. Each had knowledge of Plaintiff's disability, of the habitability and utility violations in Plaintiff's unit, and of the ongoing municipal investigations, and each possessed authority to remedy those conditions but chose not to do so. Where Redfern personnel exceeded their authority, Redfern and NHR II's failure to discipline, correct, or reverse their conduct constitutes ratification. Redfern Properties LLC and NHR II Master Tenant LLC are responsible for the acts and omissions of their agents under principles of respondeat superior and agency, and are independently liable for the policies, practices, and deliberate indifference that caused, enabled, and ratified the violations alleged herein.

## IV. FACTS

40. All allegations are supported by contemporaneous evidence in Plaintiff's possession, including student ledgers, billing records, email correspondence, medical directives, video recordings with embedded metadata, photographs with embedded metadata, police reports, municipal inspection records, and insurance claim documentation. Plaintiff's allegations are based on personal knowledge of events she experienced or observed, review of documents in her possession, and information she reasonably believes will be confirmed by evidence obtained in discovery. Plaintiff anticipates that discovery will produce additional evidence including internal university communications, Microsoft Teams messages and channel posts among Student Life, Disability Access Services, Housing, Finance, and Office of Student Conduct and Conflict Resolution administrators, text messages and call logs among individual Defendants, insurance claim diary notes and adjuster communications, SEVIS activity logs and DSO certification

records, video surveillance footage from 144 State Street including footage of the December 2, 2024 traumatic brain injury that Redfern Properties LLC refused to produce following Plaintiff's written request in February 2025 and formal preservation demand in October 2025 correspondence, and key-fob access logs for the period September 2024 through January 2026.

41. Plaintiff's case is supported by a multidisciplinary treating-physician record and objective medical imaging documenting the causal sequence from institutional funding failure to traumatic brain injury to ongoing neurological impairment. That record includes MRI imaging demonstrating bilateral frontal encephalomalacia and a neuropsychological evaluation establishing measurable cognitive deficits that are baseline-referenced and ongoing, as well as neuro-optometric evaluation confirming post-traumatic visual and oculomotor deficits, including convergence insufficiency and impaired tracking, which further limit Plaintiff's ability to read, use screens, and participate in academic work without exacerbating her neurological symptoms.

42. Plaintiff's prior professional earnings history, spanning more than fifteen years and documented across major international institutions, establishes a measurable baseline against which the economic consequences of institutionally caused degree delay are directly calculable. Bureau of Labor Statistics occupational employment and wage data for computer science and artificial intelligence roles provides a publicly available, judicially noticeable benchmark for graduate-level compensation in Plaintiff's field. The difference between that benchmark and Plaintiff's actual earnings during the period of institutionally caused delay is a calculable arithmetic figure, not a speculative projection. Where Defendants' own conduct has made more precise calculation difficult - by disrupting Plaintiff's degree timeline, blocking her thesis progress, and preventing her participation in the recruiting cycles and professional networks that would have established her market value at graduation - the risk of that imprecision falls on Defendants,

not on Plaintiff. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931). Plaintiff reserves the right to designate retained expert witnesses under Rule 26(a)(2) to quantify economic damages within the deadlines established by the Court's scheduling order.

43. In addition to material academic, financial, and housing harms, Defendants' conduct has left Plaintiff with a false and stigmatizing disciplinary record and internal 'dangerous and armed' characterization that now follow her in Northeastern's internal systems and partner databases, impairing her ability to secure housing, employment, and further study. To restore Plaintiff to the position she would have occupied absent this conduct and to prevent ongoing reputational harm, Plaintiff seeks expungement of the false disciplinary record, correction of her education records, and narrowly tailored written statements on university letterhead that accurately reflect her academic and conduct standing.

44. Sections A through F describe a sequence of institutional conduct spanning January 2024 through January 2026. Each section describes a distinct phase. Each phase was executed by named individuals acting within their institutional authority. Each actor possessed documented knowledge of the circumstances produced by the phase that preceded theirs - and proceeded. The sequence is not disputed. The dates are documented. The communications are in writing. The evidence is in Plaintiff's possession and in the institutional records Defendants control. What follows is that record, in the order in which it occurred.

## A. INDUCEMENT

45. Northeastern University competitively recruited Plaintiff as an Alfond Scholar on the basis of prior degrees, fluency in several languages, and more than fifteen years of international

experience shaping law, policy, and security frameworks for global audiences. She serves as a judge in international competitions, engages continuously with the United Nations Office of the High Commissioner for Human Rights on artificial intelligence governance, and brought to the institution independent prototype development and related intellectual property Northeastern verified before making the award. Northeastern has featured the profile of scholars like Plaintiff in its institutional recruitment and marketing materials. Each representation was a promise. Each promise created an obligation. Northeastern assumed every one of them and breached every one of them.

46.Northeastern documented the Alfond Scholarship as part of Plaintiff's financial aid package and certified it, along with Plaintiff's own funds and a pre-approved designated private loan, on her Form I-20 as verified, available funding sufficient to support her F-1 studies. Plaintiff relied on those representations and certifications in choosing to enroll at Northeastern rather than pursue other opportunities and in relocating internationally to Maine. As an F-1 visa holder, Plaintiff's legal right to remain in the United States depended entirely on Northeastern's continued sponsorship - a structural power imbalance in which every act of institutional pressure carried consequences no domestic student would face, and in which Northeastern's control over Plaintiff's institutional standing was total.

47.The relationship between Plaintiff and Northeastern was governed by enforceable representations made in writing. The award letter documented the Alfond Scholarship. The Form I-20 certified the availability of documented funding. Published academic policies promised qualified instruction and fair academic process. The housing agreement committed Northeastern to residential accommodation it assigned, managed, and controlled - for which it collected $1,338 per month. Enrollment materials and published institutional policies promised compliance with the full body of federal civil rights law to which Northeastern bound itself.

Those same materials promised access to student wellbeing services, the WeCare program, emergency support systems, residential life support, wellness coordination, and the full suite of student support infrastructure Northeastern aggressively markets to prospective students as part of the educational experience it sells. Each representation created a specific, documented obligation. None was honored. When Plaintiff sustained a traumatic brain injury in Northeastern-managed housing, not one of those systems activated on her behalf. She called the health center herself, thirty-one days later, and the nurse who answered expressed surprise that no one had reached out. Defendants did not merely breach their obligations. They collected every dollar those obligations were designed to justify - and delivered nothing they promised. The inducement that brought Plaintiff to Maine was built on representations that were false when made and designed to bind her before she could discover they were false.

48.These facts establish the contractual and institutional framework governing all subsequent conduct and form the foundation of Plaintiff's claims for breach of contract, fraudulent misrepresentation, negligence, and the deliberate indifference actionable under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Fair Housing Act.

**B. DEPRIVATION**

49.The representations Northeastern made to secure Plaintiff's enrollment and reliance - the scholarship, the loan, the housing, the support services - were operative from the date of her arrival. None of them were. Plaintiff arrived in the United States on January 5, 2024, having secured an institution-recommended non-federal student-loan based on a two-year program timeline and an Alfond Scholarship certified by Northeastern's Designated School Officials on her Form I-20. Despite the January 8, 2024 certification of both the scholarship and the loan on Plaintiff's Form I-20 as verified and available funding, Northeastern failed to disburse either

source of funding for 270 consecutive days. The loan was finally disbursed on October 4, 2024, after nine months of deprivation. As an F-1 student legally barred from off-campus employment, Plaintiff had no lawful alternative source of income during this period. Northeastern collected tuition, housing payments, mandatory insurance premiums, and student services fees throughout.

50. Approximately six weeks into the program, during a meeting convened for the explicit purpose of pressuring Plaintiff to secure additional external loan funding, Defendant Little, operating under Defendant Atwood's direct supervisory authority and in her presence, accused Plaintiff of having entered the United States illegally and of having committed fraud against the Department of Homeland Security to secure her F-1 visa - the visa Northeastern had itself recruited her to obtain, certified through its own Designated School Officials, and sponsored. The accusation was not incidental to the meeting. It was the mechanism of it. By imputing two federal offenses to a student whose legal status depended entirely on the institution making them, Little ensured that Plaintiff understood the consequences of non-compliance before she was asked to sign anything. The accusation was made in the presence of Defendant Atwood, who had authority to stop or correct it and did neither. It was not retracted. No institutional correction was issued. No action was taken against the officer who made it. The financial demand that followed was made in the shadow of that accusation.

51. In the same meeting, Defendant Little then demanded that Plaintiff sign financial attestations that falsely represented her financial circumstances as a condition of securing an additional loan from another company - a loan made necessary by Northeastern's own 270-day disbursement failure. Those attestations were to be submitted to a private loan provider in support of a credit application. Signing them as presented would have required Plaintiff to make materially false statements on a federal financial instrument. The structure of that demand was coercive in a

specific and documented way: Plaintiff had just been accused of immigration fraud by a financial aid officer in the presence of her supervisor. She was then asked to commit a different federal offense in writing, in the same room, before the same supervisor. The implication did not require articulation. Plaintiff refused. She possesses documentary evidence of those attestations and the circumstances under which they were presented. Defendant Atwood was present, had authority to stop the coercion, and did not stop it. The certified funding that Northeastern had represented as available on Plaintiff's federal immigration documents remained undisbursed. It would remain undisbursed for the duration of that 270-day period. Within days of that refusal, Northeastern placed a bar on Plaintiff's student account and referred it to a collections agency - before she had received a single invoice, before a single payment was due, and during a funding crisis entirely of Northeastern's own making.

52. In August 2024, after Plaintiff complained in writing about the 270-day deprivation and its physical consequences, Defendant Mallett authorized a $27,000 credit to Plaintiff's account covering Spring and Summer 2024 housing and tuition charges. That authorization was an institutional acknowledgment of wrongful billing. Despite that acknowledgment, Northeastern continued billing disputed amounts. Defendant Chuprevich subsequently told Plaintiff her account had not been referred to collections. Plaintiff possesses documentary evidence confirming that it had, and confirming the date on which the referral occurred.

53. In September 2024, Plaintiff communicated to Defendant Chuprevich in writing that the twelve-to-eighteen-hour weekly commute - made necessary by Northeastern's failure to disburse certified funding in time for Plaintiff to secure housing in Boston before the Fall 2024 term began on September 4, 2024 - was producing a level of physical strain she described as feeling like "a bottle of Coca Cola about to burst." Chuprevich received that communication,

took no action, and made no referral to student wellbeing, wellness coordination, or any other institutional support service.

54. During the 270-day nondisbursement period, Plaintiff experienced severe food insecurity and malnutrition. Plaintiff's treating hematologist documented iron-deficiency anemia with a cause "likely multifactorial secondary to malabsorption, decreased iron intake, and possibly bleeding," noting that Plaintiff did not tolerate oral iron and required intravenous iron for treatment with ongoing laboratory monitoring. Anemia, exhaustion and malnutrition acted as vulnerability multipliers compromising Plaintiff's pre-injury resilience in the months immediately preceding the December 2, 2024 traumatic brain injury.

55. Plaintiff's treating integrative medicine physician documented that Plaintiff's post-concussive syndrome clinical course was more prolonged than expected with continued neurologic symptoms and fatigue related to the combination of her head trauma from the fall and complicated by malnutrition and multiple stressors including housing instability, financial instability, and commuting up to four hours per day. The same nutritional deprivation that preceded the injury prolonged its consequences. That clinical finding establishes four independent categories of institutional conduct: nutritional deprivation, housing destabilisation, financial obstruction, and transportation burden, each identified in writing by a treating physician as a contributing cause of prolonged neurological harm. Northeastern controlled all four and is responsible for all four. Throughout this period, Northeastern withheld certified scholarship funds while collecting tuition, housing fees of $1,338 per month, and mandatory insurance premiums whose stated purpose included coverage for exactly the treatment Plaintiff required and could not access. The 270-day disbursement failure did not end at the bank. It ended in a hospital.

56. Northeastern's Designated School Officials certified the Alfond Scholarship as active and available on four successive Forms I-20 issued to the Department of Homeland Security. In November 2025 - nearly two years after Plaintiff's enrollment and more than a year after the scholarship should have been applied - Northeastern claimed for the first time, in a written communication, that the Alfond Scholarship had been cancelled due to a campus transfer. Northeastern produced no written cancellation notice, no amended award letter, no corrected billing statement, and no contemporaneous documentation supporting this claim. Each of the four successive federal immigration documents issued after the alleged cancellation date certified the scholarship as active. Federal immigration certifications are legal instruments executed under penalty of law. They control. A claim made two years after enrollment, unsupported by any contemporaneous record, does not survive four successive federal certifications to the contrary.

57. Only when Plaintiff asked a financial officer in November 2025 to confirm that the Alfond Scholarship would be applied to her account did Northeastern, for the first time, assert that the scholarship had been cancelled due to a campus transfer. Until that moment, Plaintiff reasonably relied on Northeastern's federal certifications and billing as evidence that the scholarship existed and would be applied each term. The November 2025 response disclosed that no scholarship funds had ever been applied, that Northeastern had been billing and collecting as though no scholarship existed, and that its retroactive cancellation claim was flatly contradicted by four successive Forms I-20 certifying the scholarship as active.

## C. INJURY

58. The physiological deterioration produced by the 270-day nondisbursement period did not resolve before the Fall 2024 term began. On December 2, 2024, after nine months of malnutrition, prolonged financial and institutional stress, and a 12-to-18-hour weekly commute sustained across 3 months of the Fall 2024 term, Plaintiff sustained a traumatic brain injury in the 144 State Street unit. She sought emergency care that day. In the days, weeks, and months immediately following the injury, Plaintiff's body was covered in extensive bruising along the right side, visible in photographs and recorded by her medical team. She had difficulty standing without support, could not walk more than short distances without dizziness, experienced fluctuating vision and pronounced eye strain, and was unable to concentrate without disproportionate effort to complete her graduate-level coursework.

59. Plaintiff's treating neurologist documented a traumatic brain injury confirmed by MRI imaging demonstrating bilateral frontal encephalomalacia. Those findings reflect permanent structural changes to brain tissue that are objective, imaging-verified, and not subject to dispute on credibility grounds. The neurologist's clinical notes document ongoing post-concussive sequelae including headaches, visual disturbances, dizziness, balance difficulties, fatigue, and impaired concentration. Those symptoms produce measurable cognitive limitations, including reduced processing speed, difficulty with complex tasks, and diminished tolerance for sustained cognitive effort. A separate neuropsychological evaluation, ordered by that neurologist to complement the MRI findings, independently confirmed post-concussive deficits in processing speed, memory, executive function, and attention and provided a baseline against which ongoing impairment and future recovery are objectively measurable. In addition, a neuro-optometrist has confirmed post-traumatic visual and oculomotor deficits, including convergence insufficiency and impaired tracking, which further limit Plaintiff's ability to read, use screens, and engage in extended academic work without triggering or worsening neurological symptoms.

60. On December 3, 2024, Plaintiff notified her academic advisor and professors of the injury, providing a medical note prescribing bedrest. On December 8, 2024, she notified Roux housing management of the injury in writing, copied her advisor, and provided photographic documentation of her visible wounds and physical incapacity, including the right-sided bruising and visible head injuries. Those communications were also directed to housing management personnel exercising operational authority over 144 State Street under Redfern Properties LLC's property management agreement. Redfern Properties LLC thereby also received actual notice of Plaintiff's disability, her physical incapacity, and the circumstances of her injury no later than December 8, 2024. No housing official conducted a welfare check. No student support system activated.

61. Beginning December 23, 2024, Plaintiff submitted formal disability accommodation requests through Northeastern's Disability Access Services, providing complete clinical documentation from her clinician prescribing housing stability as medically necessary during active traumatic brain injury recovery.

62. Until early January 2025, none of the institutional systems funded by Plaintiff's tuition, housing payments, and mandatory health insurance premiums—residential life, wellness coordination, emergency support services, or disability services—activated to assist her in obtaining care or stabilizing her housing. Plaintiff reasonably relied on the University, as her institutional and immigration sponsor, to provide at least a welfare check and basic care navigation, such as directing her to appropriate medical facilities, after receiving graphic photographic notice of a head injury in university-assigned housing.

63. On January 7, 2025, after more than a month without institutional contact, Plaintiff called the university health center herself. The nurse who answered expressed surprise that no institutional assistance had been provided in more than thirty days since the injury. Plaintiff did not begin coordinated neurological care at the nearest medical center until January 31, 2025 - sixty days after the injury occurred.

64. Because the university student housing located on 144 State Street, Portland 04101 is located approximately a 12-minute walk from one of Maine's major medical facilities at 22 Bramhall Street, Portland 04101, Plaintiff's providers viewed housing stability at that address as medically necessary to ensure continuity of her neurological treatment, because of its close proximity to that medical center providing her TBI care. Defendant Chuprevich, in her capacity as Housing Director, subsequently granted a housing accommodation in writing based on this medical documentation.

65. Following Plaintiff's traumatic brain injury in university housing, Defendant Chuprevich, in her capacity as Roux Housing Director, promised to connect Plaintiff with the appropriate insurer to address the injury that had occurred in Northeastern-assigned housing.

66. On February 24, 2025, Defendant Redfern's insurer sent Plaintiff a written communication stating that, pursuant to the lease contract with Northeastern, Northeastern would be the party to handle the claim and assigning a claim number to Northeastern's adjuster. Plaintiff repeatedly contacted the assigned adjuster by email and telephone seeking a coverage determination and instructions for submitting medical bills, but no substantive processing occurred for thirteen consecutive months. Throughout this period, Northeastern continued to collect housing and tuition payments whose cost structure included liability coverage for this kind of campus-housing injury, while the claim attached to that coverage remained unprocessed.

67. Shortly after, Plaintiff submitted a written request to Redfern Properties LLC for video surveillance footage documenting the circumstances of the December 2, 2024 traumatic brain injury sustained in the building under Redfern's operational management. Redfern refused to produce the footage. Redfern then informed its own insurer that under the property management contract with Northeastern, Northeastern bore contractual responsibility for the claim. Northeastern remained the designated claim-handling party on Redfern's February 24, 2025 correspondence. No substantive processing occurred. The footage remained withheld. The adjuster did not act.

68. In October 2025, Plaintiff issued a formal preservation demand covering all surveillance footage from 144 State Street for the full period of her occupancy. The footage has not been produced. Its continued non-production following a formal preservation demand is spoliation and will support a request for adverse inference instructions at trial. During this same period, Plaintiff's out-of-pocket medical expenses accumulated across multiple disciplines of care, and she was unable to obtain the full scope and timing of treatment her providers recommended. First, the fifty-nine-day delay between the injury and the start of coordinated neurological care deprived her of intervention during the most critical phase of post-concussive recovery. Then, because the designated liability claim remained unprocessed and no coverage determination issued, Plaintiff was too cash-poor to attend all recommended appointments and therapies, compounding the neurological regression and physical deterioration already documented in her medical record. Treating providers have explained that these delays and gaps occurred during the most critical neuroplasticity window for post-concussive recovery, and that opportunities for improvement lost during that period cannot be fully regained later.

**D. DISPOSSESSION**

69. In September 2024, Northeastern assigned Plaintiff to a housing unit at 144 State Street, Unit 518, Portland 04101, Maine - a windowless sleeping room measuring approximately 134.65 by 112.6 inches, containing a single fixed, non-operable window measuring approximately 9 by 33 inches and approximately 2.06 square feet of glazing, significantly below the natural light requirements for residential sleeping spaces under Portland City Code, and lacking operable natural ventilation. The closet was too narrow to accommodate standard clothing hangers. On the first night of occupancy in September 2024, Plaintiff documented an insect infestation in writing. She reported the conditions and requested a transfer immediately. Northeastern charged 1,338 per month for this unit, collected premium rent for sixteen consecutive months, and took no remedial action. Plaintiff possesses video recordings and photographs with embedded metadata documenting the conditions of the unit from the date of first occupancy through the date of eviction. Northeastern assigned Plaintiff to this unit with knowledge of, or in reckless disregard of, municipal habitability standards and then spent sixteen months billing her for it.

70. An adjacent, light-filled bedroom in the same unit became available after Plaintiff's roommate moved out in February 2025. On March 3, 2025, Plaintiff formally requested a transfer to that room, explaining in writing that natural light was medically necessary during traumatic brain injury recovery and that the move would reduce her housing costs. The request was denied. The vacant room remained unoccupied for eleven consecutive months through the entirety of Plaintiff's documented neurological recovery and active treatment. Northeastern denied a disabled student a medically justified room transfer within the same unit to an identical room that sat empty and continued collecting rent on the room she was confined to.

71. In October 2025, Redfern Properties conducted a formal "health and safety" inspection of Plaintiff's unit at 144 State Street after Defendant Barry asked to enter the residence with a Redfern staff member. Plaintiff agreed to inspection by Redfern but, in a written accommodation request citing retaliation and disability-related harm, refused Barry's entry and requested a neutral inspector instead. A Redfern agent conducted the inspection. It found no issues, generated no deficiencies, and no follow-up report, and Plaintiff recorded the entire inspection on video with embedded metadata. The tenant Barry had previously labeled as dangerous and armed to Northeastern, Redfern, and law enforcement passed a professional property inspection without a single problem. Two months later, Redfern cut Plaintiff's heat, issued a notice to vacate, and executed an illegal eviction. The October 2025 inspection and Plaintiff's written refusal of Barry's entry directly contradict Barry's dangerousness claims and show she did not actually believe Plaintiff posed a safety risk.

72. On December 15, 2025, heat to Plaintiff's unit was cut during a Maine winter while Plaintiff was under active neurological treatment. Plaintiff reported the concern to Portland Code Enforcement on December 19, 2025, documented habitability violations consistent with conditions Plaintiff had reported since September 2024, and requested remediation. Until December 21, 2025, internal records subsequently confirmed that no equipment malfunction had occurred during the heat deprivation period. The cutoff was not mechanical. It was deliberate. Defendant Dorcus submitted written statements to Portland Code Enforcement on two separate occasions denying that any system errors had been recorded during the relevant periods. Her own monitoring data confirmed no equipment malfunction. A property manager who submits written denials to a government authority stating that no system errors occurred during a period her own records confirm involved no mechanical failure has not made an administrative error; she has made a knowingly false submission to a public servant in violation of Maine Title 17-A § 354.

73. On December 18, 2025, Defendant Dorcus issued Plaintiff a notice to vacate. Plaintiff had no contractual relationship with Redfern Properties LLC. She had never signed an agreement with Redfern, never paid Redfern directly, and owed Redfern no legal obligation. Redfern had no independent legal standing to issue that notice. Its decision to do so was not property management. It was Northeastern's eviction directive transmitted through a third-party entity with no contractual relationship with the tenant - a structure designed to place Redfern's name on the notice while Northeastern retained distance from the act.

74. On December 22, 2025, Redfern and Northeastern representatives appeared at Plaintiff's door without prior written notice, stated purpose, or emergency justification. Later that day, Redfern provided notice of an intended entry. Plaintiff responded within twenty minutes requesting rescheduling. Defendant Dorcus responded by characterizing Plaintiff's explicit rescheduling request as authorization to enter the following day at 2:00 PM, misrepresenting in writing Plaintiff's request for rescheduling as consent to entry. On December 23, 2025, Redfern and Northeastern representatives again appeared at Plaintiff's unit. A Redfern representative entered in Plaintiff's absence without consent and without emergency justification, leaving a letter folded on the counter inside the residence. Plaintiff possesses photographic documentation with embedded metadata of the notice of entry on the exterior doorknob and the letter placed inside her unit. On December 23, 2025, Plaintiff wrote to Portland Code Enforcement requesting unannounced inspection specifically because conditions had changed temporarily following advance notice to the property manager. That request is in the municipal record. It was made before this lawsuit, before any adversarial proceeding, and before any judicial filing. It established, in real time and on the public record, that Defendant Dorcus was concealing habitability violations from municipal investigators by temporarily altering

conditions following advance notice and that Plaintiff had identified and documented that pattern while it was occurring.

75. On January 2, 2026, Plaintiff filed a motion for Temporary Restraining Order in Cumberland County Superior Court, with a hearing scheduled for January 26, 2026 to review precisely the conduct now at issue. Defendants had actual knowledge of that filing and that hearing date before they executed the January 12, 2026 entry. They proceeded anyway. The decision to execute a physical lockout ten days before a scheduled judicial hearing, rather than await the Court's determination, was not an administrative oversight. It was deliberate circumvention of the judicial process Plaintiff had invoked.

76. On January 12, 2026, Defendants Dorcus and Chuprevich entered Plaintiff's unit at 144 State Street using a master key without her consent and without any court order. Portland Police were called and responded to this entry. Plaintiff was on the phone with Portland Police while Defendant Dorcus physically obstructed her from closing her own door. Defendant Dorcus stated on recorded audio that the illegal eviction she was executing was "not an eviction." Plaintiff filmed the entire entry. Within two minutes of Northeastern's physical entry into Plaintiff's unit, Redfern executed the remote deactivation of Plaintiff's key-fob access number 36222 through its electronic access control system. Code Enforcement intervened and key-fob access was restored at 4:13 PM. The two-minute synchronization between Northeastern's physical presence inside the unit and Redfern's remote deactivation of Plaintiff's access credentials required communication between the two entities. That communication is discoverable. On January 13, 2026, after attending the first day of Spring 2026 classes, Plaintiff returned at 10:47 PM to find her key-fob access deactivated again - re-deactivated by Redfern after Code Enforcement had restored it the previous day - and was locked out overnight in winter conditions without access to prescription medications, including refrigerated

medications essential to her traumatic brain injury treatment. No judicial eviction order existed. No writ of possession had been obtained. Nothing had changed since the previous day except that Code Enforcement had left.

77. On January 14, 2026, Defendants Dorcus, Barry, and Chuprevich, along with contractors acting under their direction, entered Plaintiff's dwelling and removed her personal property without a court order, without a writ of possession, and without any judicial authorization of any kind. The property removed included refrigerated prescription medications prescribed for active traumatic brain injury recovery; additional prescription medications; academic devices and materials essential to Plaintiff's thesis work; personal documents; jewelry; clothing; and perishable food rendered worthless by the period of inaccessibility. Plaintiff was present throughout, objected on video, and recorded the removal in its entirety. Defendant Chuprevich stated on video that Plaintiff had refused to move out - despite Plaintiff's documented housing payments and the complete absence of a court-ordered eviction. Defendant Chuprevich subsequently sent a written communication stating that Plaintiff had been handed a bag containing all medications that had been identified. Plaintiff responded in writing at 1:59 PM the same day, documenting that the statement was false and that she possessed video evidence directly contradicting it. A Redfern Properties employee handed Plaintiff the bag. It contained an iPad, a notepad, and painkillers. It did not contain the prescription medications Chuprevich's written communication claimed had been provided. The video shows what was in the bag. Portland Code Enforcement was actively investigating habitability violations at the unit at the time of the removal. Defendants completed the property removal before that investigation concluded - eliminating the complaining tenant and municipal access to the premises simultaneously.

78. These acts constitute disability discrimination and retaliation under the Fair Housing Act, unlawful self-help eviction under 14 M.R.S. § 6002, retaliatory eviction under 14 M.R.S. § 6024, trespass, conversion, intentional interference with medical treatment, unjust enrichment, civil conspiracy under 42 U.S.C. § 1985, knowing failure to prevent under 42 U.S.C. § 1986, active concealment of habitability violations from municipal authorities under Maine Title 17-A § 354, and spoliation through Redfern's continued non-production of surveillance footage following a formal preservation demand.

**E. OBSTRUCTION**

79. In Spring 2024, Plaintiff was enrolled in CS5001 and CS5002 at the Roux Institute. Defendant Domino was assigned as the CS5001 instructor. At the time of the conduct alleged herein, Domino lacked the doctoral credentials ordinarily required to teach at the graduate level, a fact Northeastern knew when it made the assignment. Approximately six weeks before the end of the Spring 2024 term, before Plaintiff's submitted coursework had been assessed, Domino told Plaintiff to "prepare to fail" in the presence of Plaintiff's academic advisor, Defendant Gill. Domino then refused to grade Plaintiff's submitted work and issued a failing outcome. Plaintiff passed CS5002 satisfactorily in the same term, establishing that the failure in CS5001 was not a function of academic performance. An unqualified instructor told a student to prepare to fail before reviewing her work, then refused to grade it, then issued a failing grade. Northeastern knew Domino lacked the required credentials when it assigned her. That is not academic discretion. It is institutional recklessness in the assignment of unqualified teaching staff, followed by the deployment of that instructor's grade as a permanent academic record.

80. Defendant Gill was present when Domino told Plaintiff to prepare to fail. Gill filed no report, made no intervention on Plaintiff's behalf, and took no remedial action. Instead of advocating

for correction of the failing grade, Gill issued Plaintiff with repeat-course funding to retake courses she had already completed. Northeastern subsequently issued approximately $14,000 in repeat-course funding through an institutional mechanism not described in any student handbook, financial aid materials, or publicly available institutional documentation. That funding created a false institutional record suggesting academic deficiency rather than instructor misconduct, and buried the grading abuse under a layer of financial paperwork never explained to Plaintiff - a structure that served Northeastern's interest in concealing the underlying misconduct far more than it served Plaintiff's interest in correcting it.

81. Northeastern's Office of General Counsel received written notice of Defendant Domino's conduct in May 2024. Defendant Mallett received the same written notice. Neither took corrective action. Neither contacted Plaintiff. Neither initiated any review of the grade, the instructor's qualifications, or the circumstances of the failing outcome. As a direct result of Domino's refusal to grade and Northeastern's refusal to correct it, Plaintiff was required to retake courses she had already completed, losing two academic terms of normal degree progression - terms compounded on top of the existing 270-day funding obstruction and, later, the effects of her traumatic brain injury.

82. On December 20, 2024, Plaintiff requested temporary disability accommodations from Disability Access Services for the CS5002 examination, including permission to take the exam remotely or in a location closer to her Portland residence, due to serious mobility limitations and acute post-concussive symptoms following her December 2, 2024 traumatic brain injury. On December 23, 2024, the disability office denied these requests without substantive clinical justification. As a direct result, Plaintiff was required to travel from Portland to Boston to sit the examination in person ten days after sustaining a traumatic brain injury. She departed before dawn, traveled approximately six hours round-trip while limping and in significant pain, and sat

the examination with a bandaged leg extended to an adjacent chair and ongoing post-concussive symptoms. Northeastern denied a brain-injured student a remote examination accommodation and then required her to travel six hours to take it in person.

83. The registration block maintained by OSCCR following the collapsed disciplinary proceedings addressed in Section F directly obstructed Plaintiff's thesis timeline during the precise period when thesis commencement was scheduled. Plaintiff was expected to begin substantial thesis work and prepare for graduation in Spring 2026, including participation in conferences, research collaborations, and recruitment opportunities aligned with an on-time graduation timeline. The combination of the registration block, the January 2026 eviction, and the loss of access to academic devices and materials essential to her thesis work directly prevented that progression. Plaintiff's thesis delay is not an academic outcome. It is an institutional act with a paper trail naming the administrators who caused it.

84. These acts constitute breach of contract, negligence, fraud, intentional infliction of emotional distress, and retaliation for the assertion of disability rights under Section 504 and the Americans with Disabilities Act, and directly caused the academic delays, degree timeline disruption, and professional window closures quantified in Section G.

## F. RETALIATION

85. On March 3, 2025, Plaintiff requested reduced housing fees under Northeastern's emergency policy for students with unexpected medical expenses to help offset the mounting medical bills. Three days later, on March 6, 2025, Plaintiff received notification that the Office of Student Conduct and Conflict Resolution had opened a disciplinary investigation based on an alleged

conflict with a former roommate who had already moved out of the unit on February 24, 2025. On March 10, 2025, Roux Housing sent Plaintiff a notice to vacate setting an April 30, 2025 move-out date. Five adverse institutional acts in four days - disciplinary investigation, fee reduction denial, housing accommodation denial, room transfer denial, and eviction notice - all following Plaintiff's assertion of her legal rights. The temporal sequence does not require inference. It is the retaliation.

86. Approximately ten days before the alleged incident underlying the collapsed disciplinary case, the former roommate was instructed by housing staff to photograph Plaintiff's kitchen utensils and transmit those images to housing administration. Housing officials at that time already possessed Plaintiff's December 8, 2024 injury photographs documenting her visible wounds and physical incapacity following the traumatic brain injury she had sustained in the same unit. They held photographs of a disabled student's injuries. They then collected photographs of her kitchen utensils. Using those photographs and the dangerous tenant narrative that Defendants Chuprevich and Barry had been building since December 2024, the institution filed disciplinary charges including Dangerous Weapons and Endangering Behavior against a student whose disability injuries it was simultaneously holding in its own files.

87. Defendants Chuprevitch and Barry transmitted the dangerous and armed characterization to internal university authorities, to the Portland Police Department, and to Redfern Properties LLC in writing while simultaneously holding Plaintiff's December 8, 2024 injury photographs proving her physical incapacity at the time of the alleged threat. Barry instructed the former roommate to file a police report with the Portland Police Department. The former roommate initially declined. Chuprevitch and Barry persisted. A police report was ultimately filed. No Portland Police officer ever contacted Plaintiff. Northeastern's own disciplinary adjudicator - Defendant O'Neil SanFilippo - subsequently found insufficient information to suggest any

threat had existed. Chuprevitch and Barry still transmitted a false characterization of Plaintiff as dangerous and armed to a law enforcement authority, in writing, while holding documentary proof of its falsity in her own files, in violation of Maine Title 17-A § 802. The adjudication is the proof of its falsity.

88. On February 24, 2025, Defendant Barry disclosed Plaintiff's protected educational records and disability-related medical information to the then Property Manager for Redfern Properties LLC, in writing. Barry's own email states: "I have informed…, Property Manager for Redfern, not the University." Said property manager is not a Northeastern University employee, not a school official, and not a person with a legitimate educational interest in Plaintiff's protected records within the meaning of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g. That disclosure armed Redfern with comprehensive knowledge of Plaintiff's disability status, accommodation status, housing circumstances, and disciplinary proceedings more than ten months before the January 2026 eviction, and more than ten months before Redfern issued a notice to vacate to a tenant it had no contract with.

89. On February 28, 2025, the former roommate formally withdrew from the disciplinary process in writing, stating she had already moved and saw no reason to engage further. On March 5, 2025, five days after the complainant's formal written withdrawal and with no new incident, no new conduct, and no new factual basis, Barry filed the institutional disciplinary complaint anyway. Barry did not respond to the complainant's withdrawal; she replaced it. The institutional prosecution that followed was entirely Barry's construction, filed after the complainant left, maintained after the complainant withdrew, and executed against a disabled student who had never been the subject of a filed police report and whose injuries the institution had documented in its own files.

90. Defendant O'Neil SanFilippo initiated and maintained the disciplinary charges. She served simultaneously as investigator, sole adjudicator, self-declared board, and signatory on the denial of the appeal of her own decision. On the record during the July 28, 2025 hearing, O'Neil SanFilippo stated that board members had not yet been recruited and that her understanding was that Plaintiff was not a Boston student, the basis on which a properly constituted disciplinary board was denied to a Roux Institute student. Geographic origin is not a permissible basis for denying a student the institutional protections guaranteed by Northeastern's own published policies. O'Neil SanFilippo granted Plaintiff advisor rights on April 30, revoked them on June 30, and within seventy-two hours issued contradictory scheduling communications she described on the record as both true simultaneously. She manufactured procedural deadlines to foreclose appeal and proceeded in deliberate disregard of Plaintiff's documented neurological disability and treating physician's directives throughout.

91. On August 7 and 18, 2025, after Plaintiff submitted a seventy-page sworn defense with exhibits, O'Neil SanFilippo issued findings. She found Plaintiff NOT RESPONSIBLE for Dangerous Weapons. She found Plaintiff NOT RESPONSIBLE for Endangering Behavior, expressly noting insufficient information to suggest any threat had existed. Despite finding Plaintiff not responsible on every serious charge, O'Neil SanFilippo imposed a post-finding sanction requiring Plaintiff to complete a Living with a Roommate module. Plaintiff had no roommate at that time and had not had one since February 2025. The sanction had no factual basis in the adjudicated record. It operated as a registration block preventing Plaintiff from enrolling in subsequent semesters. O'Neil SanFilippo then signed the denial of Plaintiff's appeal of her own decision, serving as the appellate authority over a decision she had made as the sole adjudicator. Plaintiff's compliance with the module was executed under documented coercion, submitted under protest, with full written reservation of all legal rights. That statement is in Northeastern's official file.

92. Plaintiff appealed. A Vice Chancellor reporting to Defendant Estabrook reviewed the appeal, identified sixteen documented factual inaccuracies in O'Neil SanFilippo's decision, issued a formal written directive ordering reassignment of the matter and naming both McGrath and O'Neil SanFilippo by name, and acknowledged that the case handling had excluded exculpatory evidence and mischaracterized material facts. Defendant McGrath received that directive. She did not implement it. She denied Plaintiff's appeal as untimely on a deadline McGrath herself had shortened after denying Plaintiff's disability accommodation request for additional time, manufacturing the procedural defect she then wielded as the grounds for foreclosing the review a Vice Chancellor had ordered. The registration block remained in place. O'Neil SanFilippo was not disciplined. McGrath was not disciplined. No one in OSCCR was overruled. A Vice Chancellor issued a written directive naming two administrators and ordering reassignment. Both administrators ignored it. Neither faced institutional consequence. OSCCR reported ultimately to Defendant Estabrook. The record reflects no consequence for the defiance.

93. In October 2025, Redfern Properties conducted a formal "health and safety" inspection of Plaintiff's unit at 144 State Street after Defendant Barry asked to enter the residence with a Redfern staff member. Plaintiff agreed to inspection by Redfern but, in a written accommodation request citing retaliation and disability-related harm, refused Barry's entry and requested a neutral inspector instead. A Redfern agent conducted the inspection. It found no issues, generated no deficiencies, and no follow-up report, and Plaintiff recorded the entire inspection on video with embedded metadata. The tenant Barry had previously labeled as dangerous and armed to Northeastern, Redfern, and law enforcement passed a professional property inspection without a single problem. Two months later, Redfern cut Plaintiff's heat, issued a notice to vacate, and executed an illegal eviction. The October 2025 inspection and

Plaintiff's written refusal of Barry's entry directly contradict Barry's dangerousness claims and show she did not actually believe Plaintiff posed a safety risk.

94. The registration block remained in Plaintiff's academic record for more than 120 days following the not responsible findings. In November 2025, Plaintiff discovered the block was still preventing her Spring 2026 registration. To avoid further academic damage she completed the Living with a Roommate module under protest and with written reservation of all legal rights. On January 15, 2026 - three days after the illegal entry into her residence and one day after the extrajudicial removal of her property - Defendant Estabrook sent Plaintiff a written communication rejecting the applicability of disability law by name. Estabrook supervised disability accommodation through Droz, housing enforcement through Chuprevich and Barry, and student conduct through O'Neil SanFilippo and McGrath. Each system was deployed against Plaintiff during the same period. Each instrument was maintained after its stated basis had been contradicted by Northeastern's own institutional record. Each administrator whose conduct is documented in this Complaint operated within Estabrook's chain of command. None was disciplined. None was overruled. None corrected the record. Estabrook received written notice of all of it and chose, in writing, to tell Plaintiff that disability law did not apply.

95. These acts constitute retaliation for protected activity under Section 504, the Americans with Disabilities Act, and the Fair Housing Act, disability discrimination, defamation per se across three documented tracks, invasion of privacy through unlawful disclosure of protected educational and medical records, intentional infliction of emotional distress, civil conspiracy, and due process violations arising from the consolidation of investigative, adjudicatory, and appellate authority in a single administrator who found Plaintiff not responsible on every serious charge and then imposed a sanction that blocked her registration for 120 days.

## G. HARM

96. As a direct and proximate result of the conduct described in Sections A through F, Plaintiff has sustained the following injuries, each independently compensable and each causally traceable to named Defendants acting with actual knowledge of Plaintiff's circumstances and a documented choice to proceed.

97. Economic losses. Defendants forced Plaintiff to incur excess loan principal and interest across every term in which Northeastern certified the Alfond Scholarship but did not apply it, a figure calculable term by term from Northeastern's designated lending programme records and Northeastern billing. They extracted additional principal and interest by coercing her to sign false attestations under financial duress.

98. They billed Plaintiff for 27,000 dollars in wrongful charges that Defendant Mallett later acknowledged as institutional error and reversed through a lump-sum credit only after Plaintiff had endured 270 days of deprivation and collections activity. They then layered approximately 14,000 dollars in repeat-course funding on top of that history rather than correcting documented instructor misconduct, generating an institutional record that falsely reflects academic deficiency instead of grading abuse. They had sent her account to collections and damaged her credit before she had received a single invoice, during a funding crisis they created. They left a designated insurance claim unprocessed for thirteen consecutive months while Plaintiff paid unreimbursed out-of-pocket expenses across neurology, primary care, hematology, integrative medicine, neuropsychology, and counseling. They collected premium rent of $1,338 per month for sixteen months for a unit that violated Portland City Code from the first night of occupancy. They converted her property on January 14, 2026 - prescription medications, academic devices, personal documents, jewelry, clothing, and food - without

judicial process. They destroyed the value of refrigerated prescription medications by removing them from cold storage in a Maine winter. They forced Plaintiff to replace academic materials and devices essential to her thesis. They collected mandatory insurance premiums throughout the period in which the claim those premiums were meant to fund sat dormant and the evidence required to resolve it remained withheld.

99. Academic and professional losses. Defendants cost Plaintiff two full academic terms of degree progress by allowing Domino's grading refusal to stand and refusing to correct it after notice. They compounded that loss through a registration block they maintained for over 120 days days after not responsible findings, through the January 2026 eviction and seizure of academic materials, and through manufactured housing instability during the precise period when thesis work was scheduled to begin. They prevented her from presenting research, collaborating, and entering recruiting cycles aligned with an on-time Spring 2026 graduation. They degraded her competitiveness for fellowships, research roles, and senior positions whose availability tracks career stage, not absolute merit. They branded her with a false disciplinary record that describes her as dangerous and armed, transmitted that record to law enforcement and a private property manager, allowed it to stand after an adjudicator found insufficient evidence of any threat, and refused to correct it even after an appeal officer documented sixteen factual inaccuracies. Those acts damaged Plaintiff's academic trajectory and professional reputation in ways that an on-time, unimpeded graduation would have avoided.

100. Medical losses. Defendants set in motion and then aggravated a traumatic brain injury. Their 270-day funding failure produced documented malnutrition and physical deterioration that treating physicians link to the December 2, 2024 fall in Northeastern-managed housing. Laboratory records confirm iron-deficiency anemia requiring intravenous iron intervention after oral supplementation failed, causally linked by treating providers to sustained nutritional

deprivation during that period. After the injury, they left Plaintiff without coordinated neurological care for sixty days by failing to activate any of the institutional systems they controlled. They then destabilized her recovery by denying medically prescribed housing accommodations, cutting heat, entering her home without authorization, and evicting her during active treatment. Treating physicians have documented neurological regression tied to those disruptions, including post-concussive headaches, visual disturbances, dizziness, balance difficulties, fatigue, impaired concentration, slower processing speed, difficulty with complex tasks, and reduced tolerance for prolonged interactions. A neuropsychological evaluation ordered by Plaintiff's treating neurologist to complement MRI findings provides an objective, baseline-referenced record of those deficits against which ongoing impairment and future recovery are measurable. On January 13, 2026, Defendants left Plaintiff locked out overnight without access to prescription medications, including refrigerated medications essential to ongoing traumatic brain injury treatment. Brain injury recovery follows defined medical timelines. Disruption causes regression that clinicians can measure and document but cannot reverse. Neuroplasticity windows that close during forced treatment interruption do not reopen. The harm caused by the January 2026 displacement during active neurological treatment is irreparable in the legal sense - it cannot be fully remedied after the fact.

101. Emotional distress and dignitary harm. Defendants subjected a brain-injured disabled student to continuous institutional pressure for twenty-four months. They accused her of federal crimes, coerced her financially, sabotaged her academic standing, obstructed her accommodations, fabricated a disciplinary case, executed an illegal eviction, removed her prescription medications, and then put in writing that disability law did not apply to her. Treating providers have tied this pressure directly to Plaintiff's neurological recovery conditions. Plaintiff does not need to characterize that suffering; the record does it for her. A student who arrives healthy, sustains a traumatic brain injury in university housing, is denied

accommodation, is evicted without court order, has her medications taken from her home, and is told by the institution's senior leadership that disability law does not apply to her presents emotional distress that calls for judgment, not adjectives.

102. Defendants did not simply derail a private degree. They interfered with a federally authorized project. Plaintiff entered the United States after representing to the federal government that she would deliver a specific public benefit: the mass commercialization of artificial intelligence technology products. Northeastern confirmed that representation when it chose to sponsor her immigration status. Plaintiff upheld her obligation to maintain legal status through every obstruction Defendants created. Defendants did not uphold theirs. By delaying her degree, blocking her thesis, and destabilizing her housing, they delayed the work she had committed to deliver - work with documented public benefit and commercial trajectory. That delay is not a purely private harm. It is interference with the purpose for which the federal government permitted Plaintiff's presence and for which Northeastern accepted federal funds and sponsorship authority.

103. In Plaintiff's field, timing is substance. A graduate student in computer science and artificial intelligence governance policy expert who cannot present work when it is current, cannot enter the market when her cohort recruits, and cannot build networks when they form loses opportunities that no later success can recreate. Conferences accept submissions in specific cycles. Collaborations arise at specific career moments. Fellowships track graduation windows. Recruiting cycles turn once. Defendants moved Plaintiff from the on-time lane into a delayed lane they engineered. The difference is not a few months on a transcript; it is an entire set of professional opportunities that existed only at the moment Defendants pushed her off track. Those opportunities no longer exist.

104. Plaintiff's documented earnings history establishes a baseline for her earning capacity. Bureau of Labor Statistics data for computer science and artificial intelligence roles establishes an objective market benchmark. The gap between those figures and Plaintiff's actual earnings during the period of institutionally caused delay is the minimum measure of her economic loss, not its outer limit. Every loss described in this Section ties back to specific conduct by specific Defendants on specific dates. The Parties section sets out the institutional architecture that the university those choices. Sections A through F establish the deliberate indifference and retaliation that animated them. This Section establishes the harm they produced. Plaintiff asks this Court to compel Defendants to honor the obligations they assumed, to repair as fully as the law allows the injuries they caused, and to hold each named individual to account for the documented acts that bear that individual's name.

## V. CAUSES OF ACTION

105. Plaintiff's economic damages include, at minimum, the following categories: excess principal and interest incurred on the private loan while Northeastern certified the Alfond Scholarship as verified, available funding and then withheld it for 270 days; additional principal and interest taken on under financial coercion when Defendants presented false attestations for signature instead of correcting their own disbursement failure; wrongful billing in the amount of approximately $27,000 that Northeastern later acknowledged as institutional error and reversed only after months of deprivation, collections activity, and ongoing excess borrowing; approximately $14,000 in repeat-course funding that manufactured an institutional record of academic deficiency rather than correcting documented instructor misconduct; more than twelve months of unreimbursed medical expenses across six treating disciplines while a campus-injury claim sat unprocessed; sixteen months of premium rent for a unit that violated municipal habitability standards; and the costs associated with displacement, conversion of personal and

academic property, and replacement of devices and materials essential to Plaintiff's degree completion standards; and the costs associated with displacement, conversion of personal and academic property, and replacement of devices and materials essential to Plaintiff's degree completion.

106. Plaintiff brings the following causes of action under federal and Maine law arising from the conduct described in Sections A through F of the Facts.

107. Federal disability and housing statutes. Northeastern University receives federal financial assistance exceeding $268 million annually and is therefore subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and to 42 U.S.C. § 2000d-7, which confirms the availability of monetary damages for intentional violations. As a place of public accommodation, it is also subject to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq. In addition, Northeastern and its housing partners are subject to the Fair Housing Act, 42 U.S.C. § 3601 et seq., including its provisions prohibiting disability discrimination, failure to accommodate, and retaliation in housing, 42 U.S.C. §§ 3604(f), 3617. Damages under Section 504 and the ADA are available upon a showing of deliberate indifference, the standard articulated by the Supreme Court in A.J.T. v. Osseo Area Schools, 605 U.S.(2025).

108. Maine Human Rights Act. The housing and educational services at issue are public accommodations and housing accommodations within the meaning of the Maine Human Rights Act, 5 M.R.S. §§ 4553, 4581-A, 4591-4592. Defendants' conduct, as pleaded, constitutes disability discrimination, failure to accommodate, and retaliation in violation of 5 M.R.S. §§ 4581-A, 4582, 4592, and 4633. Plaintiff filed a complaint with the Maine Human Rights Commission on April 28, 2025, satisfying the administrative prerequisite to full compensatory relief under 5 M.R.S. § 4613. Civil penal damages are available up to $100,000 pursuant to 5

M.R.S. § 4613(2)(B)(7). Punitive damages are available upon a showing of malice or reckless indifference to Plaintiff's rights under 5 M.R.S. § 4613(2)(B)(7)(c). Attorneys' fees are available under 5 M.R.S. § 4614.

109. Maine landlord-tenant statutes. The 144 State Street housing is subject to Maine landlord-tenant protections, including the prohibition on self-help eviction and utility shutoff, the implied warranty of habitability and adequate heat, and the prohibition on adverse housing action taken in response to protected tenant conduct, 14 M.R.S. §§ 6001-6004, 6021, 6024. The January 2026 extrajudicial lockout, property removal, and medication seizure - conducted without judicial process, without a court order, and without a writ of possession - constitute self-help eviction in direct violation of 14 M.R.S. § 6002.

110. Education records and privacy. Northeastern's disclosure of Plaintiff's protected education records - including student status, disability-related information, and disciplinary matters - to a third-party property manager without consent contravenes the protections embodied in the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and the Maine Student Privacy Act, 20-A M.R.S. § 951 et seq. The disclosure and downstream use of Plaintiff's records operate as a factual predicate and aggravating circumstance for her overlapping state and federal claims, including invasion of privacy, disability discrimination, retaliation, and housing claims.

111. Maine common law. Under Maine common law, the conduct alleged supports claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud and fraudulent misrepresentation, negligence, intentional infliction of emotional distress, invasion of privacy by intrusion upon seclusion, defamation, and conversion. The general statute of limitations for Maine common-law claims is six years under 14 M.R.S. § 752, except defamation which carries a two-year period under 14 M.R.S. § 753. Punitive damages under Maine common law require

clear and convincing evidence of express or implied malice within the meaning of Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985).

112. Each Count that follows is grounded in one or more of these provisions. The factual paragraphs incorporated by reference in each Count are identified specifically within that Count. Liability and remedies are to be adjudicated on a unified record under Maine and federal law.

**COUNT I**

**BREACH OF CONTRACT**

Educational and Housing Services

Against Defendant Northeastern University

113. Plaintiff incorporates by reference 13- 21, 23- 39, and 44- 83.

114. Plaintiff's contract claims do not sound in educational malpractice and do not ask this Court to second-guess substantive academic judgments. Plaintiff alleges breaches of specific, identifiable promises and procedural guarantees: the affirmative financial certifications made on her Form I-20; the explicit habitability standards incorporated into her housing agreement; the written university procedures for processing disability accommodations; and the published procedural safeguards of the Code of Student Conduct. No evaluation of academic quality is required to adjudicate any of these claims.

115. Northeastern entered into a contractual relationship with Plaintiff when it admitted her to the Align programme, awarded her an Alfond Scholarship, issued a Form I-20 certifying verified funding, and billed her for tuition, mandatory fees, housing, and health insurance premiums.

116. The parties' contract is reflected in Northeastern's admissions and financial aid correspondence, scholarship and housing offers, billing statements, student handbook and policy documents, disability and housing accommodation policies, and representations made in recruitment and marketing materials regarding academic support, housing quality, wellness services, and disability access.

117. Under this contract, Northeastern was obligated to: (a) accurately administer Plaintiff's financial aid, scholarship, and loan certifications; (b) provide the educational and housing services for which it billed; (c) administer disability and housing accommodations in accordance with its written policies and applicable law; (d) process campus-injury insurance claims in good faith; and (e) not undermine Plaintiff's ability to complete her programme through arbitrary, retaliatory, or bad-faith conduct.

118. Northeastern materially breached these obligations by: (a) failing to disburse approved funding for 270 days while continuing to bill and referring Plaintiff to collections; (b) pressuring Plaintiff to take on additional institutional debt under immigration threat rather than correcting its own disbursement failure; (c) misrepresenting the status of the Alfond Scholarship while continuing to certify it on federal immigration documents after the alleged cancellation date; (d) assigning Plaintiff to substandard housing and refusing reasonable transfers; (e) failing to deploy student-support and wellness systems after receiving photographic notice of a traumatic brain injury; (f) granting a housing accommodation in writing and reversing it without contractual basis after Plaintiff asserted her legal rights; (g) failing to process a documented campus-injury insurance claim for more than twelve months; and (h) using disciplinary processes and registration blocks as instruments of institutional pressure rather than for legitimate educational purposes.

119. As a direct and foreseeable result of these breaches, Plaintiff suffered the financial, educational, physical, and professional harms detailed in the Factual Allegations. These harms include excess principal and interest incurred through the university designated loan vendor beginning October 2024, when Plaintiff was forced to borrow against the full cost of attendance because Northeastern had withheld the Alfond Scholarship it had certified as available funding for 270 days, requiring her to borrow what the scholarship was intended to cover. They include approximately $14,000 in undisclosed repeat-course funding that created an institutional record falsely suggesting academic deficiency rather than instructor misconduct. The repeat-course funding and unnecessary repeats did not increase Plaintiff's loan principal; instead, they cost her two academic terms of normal progression and created a false institutional record that mischaracterised documented grading abuse as academic deficiency. They also include more than twelve months of unreimbursed medical expenses while a campus-injury claim sat unprocessed, sixteen months of premium rent for a unit that violated municipal habitability standards, and displacement, loss of property, and time-bound professional opportunities that cannot be recreated.

120. Plaintiff seeks compensatory damages under Maine contract law. Those damages include tuition and fee refunds, housing overcharges, excess borrowing costs tied to the nondisbursement of the Alfond Scholarship to date, and reimbursement of wrongful charges billed. Plaintiff also seeks all consequential losses proximately caused by Northeastern's breaches, together with pre- and post-judgment interest as permitted by Maine law. This action is timely under 14 M.R.S. § 752, the cause of action having accrued on January 8, 2024 and continuing through January 2026.

**COUNT II**

**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Maine Common Law

Against Defendant Northeastern University

121. Plaintiff incorporates by reference 13- 21, 23- 39, 44- 83, and Count I.

122. Every contract under Maine law contains an implied covenant of good faith and fair dealing, requiring each party to refrain from conduct that, while not expressly forbidden, would deprive the other party of the benefit of the bargain.

123. Northeastern breached this implied covenant by using its discretionary powers - over funding disbursement, scholarship administration, accommodation decisions, housing assignments, disciplinary processes, and registration - to pressure, destabilise, and remove Plaintiff rather than to fairly administer the contractual relationship.

124. Northeastern's conduct was undertaken in bad faith and with knowledge of Plaintiff's vulnerability as an F-1 international student and Alfond Scholar. That conduct included the sequence of funding withdrawal, wrongful billing later credited only after months of deprivation and collections activity. It also included academic obstruction, assignment to substandard housing, denial and override of medical accommodations, extrajudicial eviction, and post-exoneration disciplinary blocks. Defendant Estabrook's written rejection of disability law by name while acknowledging Plaintiff's documented medical needs is direct evidence of bad faith at the senior administrative level.

125. As a result, Plaintiff was deprived of the core benefits of her bargain. Those benefits included a fair opportunity to complete the degree she was recruited to pursue under the promised conditions of support, safety, and lawful financial and academic administration.

126. Plaintiff seeks compensatory damages under Maine common law for the losses caused by Northeastern's bad-faith exercise of contractual discretion. Those losses include excess borrowing, unreimbursed expenses, lost housing, and delayed degree progress. Plaintiff also seeks pre- and post-judgment interest as permitted by Maine law. This action is timely under 14 M.R.S. § 752.

**COUNT III**

**DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE**

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Title III of the ADA, 42 U.S.C. § 12182

Against Defendant Northeastern University

127. Plaintiff incorporates by reference 13- 21, 23- 28, and 57- 61 and 81- 91.

128. Northeastern receives federal financial assistance exceeding $268 million annually and is subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. As a place of public accommodation, it is also subject to Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 et seq.

129. Plaintiff is a qualified individual with a disability within the meaning of these statutes. Her traumatic brain injury is documented by MRI imaging and neuropsychological evaluation confirming post-concussive cognitive deficits in processing speed, memory, executive function, and attention. Written directives from a board-certified treating neurologist establish that her impairments substantially limit major life activities including cognitive function, learning, concentrating, and caring for herself. She remained capable of meeting the essential requirements of her programme with reasonable accommodations.

130. Northeastern had actual knowledge of Plaintiff's disability and need for accommodation from at least December 3, 2024, when she provided a medical note prescribing bedrest. That knowledge was confirmed and supplemented through physician letters in January, March, September, and December 2025, each prescribing housing stability and reduced cognitive load. Defendant Chuprevich's written January 2025 accommodation grant confirms institutional knowledge and the feasibility of the requested accommodations at the time of later denial.

131. Despite this knowledge, Northeastern: (a) denied Plaintiff's request to take the CS5002 examination remotely or locally proctored despite serious mobility limitations and post-concussive cognitive symptoms ten days after her traumatic brain injury; (b) denied the identical housing accommodation that Defendant Chuprevich had granted in writing, without medical consultation and without engaging any interactive process; and (c) refused to adjust disciplinary and registration processes to account for her disability-related limitations despite a treating neurologist's written recommendation to postpone proceedings.

132. Disability Access Services closed Plaintiff's file without any determination on the housing component, without conducting medical consultation, without offering any alternative accommodation, and without engaging any interactive process. Defendant Droz subsequently stated he was uncertain what Plaintiff's accommodation request was for, despite receiving university-issued forms explicitly describing traumatic brain injury accommodation needs signed by a treating physician.

133. These failures were not justified by undue burden or fundamental alteration. The written January 2025 accommodation grant establishes that no undue burden existed at the time of the denial.

134. Defendants were deliberately indifferent to Plaintiff's federally protected rights within the meaning of A.J.T. v. Osseo Area Schools, 605 U.S. ___ (2025). Northeastern granted the accommodation in writing, then denied it without medical basis after Plaintiff asserted her legal rights. It received two successive neurologist letters prescribing housing stability as medically necessary and escalated eviction proceedings in response. It received Plaintiff's November 2025 written notice to Defendant Estabrook identifying the accommodation denial as one of three simultaneous tracks of institutional obstruction and took no corrective action.

135. Defendant Estabrook signed a letter on January 15, 2026 explicitly rejecting disability law by name while acknowledging Plaintiff's documented medical needs. That letter is the institutional record of deliberate indifference at the senior administrative level.

136. As a direct and proximate result of Northeastern's disability discrimination and failure to accommodate, Plaintiff suffered denial of medically prescribed housing stability during active neurological recovery. She remained confined in a windowless unit despite a neurologist's prescription for natural light. She lost housing through an extrajudicial eviction executed while two successive neurologist letters prescribing housing stability were in effect. Defendants seized her prescription medications, disrupted coordinated neurological care, and depressed her academic performance by denying a remote examination. Plaintiff experienced physical deterioration documented at a February 25, 2026 medical visit and neurological regression during the critical recovery phase caused by displacement from medically prescribed housing stability. Treating physicians can document these effects but cannot reverse them. They constitute irreparable harm in the precise legal sense because the neuroplasticity windows disrupted by treatment interruption do not reopen.

137. Plaintiff seeks: (a) compensatory damages for all economic losses and documented physical and psychological harm; (b) declaratory relief that Northeastern's conduct violated Section 504 and the ADA; (c) injunctive relief requiring Northeastern to correct her academic and financial records, implement compliant accommodation procedures, remove all disability-related barriers to her enrollment and academic progress, and restore her housing accommodation; and (d) attorneys' fees and costs pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12205. This action is timely, the last discriminatory act having occurred on January 15, 2026.

**COUNT IV**

**RETALIATION FOR PROTECTED ACTIVITY**

Section 504, 29 U.S.C. § 794; ADA, 42 U.S.C. § 12203; Maine Human Rights Act, 5 M.R.S. § 4633

Liability under Section 504 and the ADA is asserted against Northeastern University, and liability under the Maine Human Rights Act is asserted against Northeastern University and the individual administrators named in Paragraph 24 through Paragraph 34.

138. Plaintiff incorporates by reference paragraphs 13-30, 46-61, 67-76, 77-83.

139. Plaintiff engaged in protected activity by requesting disability accommodations through DAS using university-issued forms and by submitting physician-signed medical documentation. She challenged discriminatory grading and housing practices and filed internal appeals. She filed a complaint with the Maine Human Rights Commission on April 28, 2025. She reported habitability and utility violations to Portland Housing Code Enforcement. She sent written communications to Defendant Estabrook identifying accommodation denial and insurance suppression as institutional obstruction. She also filed a second complaint with the Maine

Human Rights Commission on January 2, 2026, covering Defendants' post-September 2025 escalation, eviction activity, and property removal.

140. Following Plaintiff's accommodation requests in early 2025, Northeastern issued five adverse actions within four days in March 2025: a student conduct investigation, a fee reduction denial, a housing accommodation denial, a room transfer denial, and an eviction notice. Following Plaintiff's April 28, 2025 MHRC filing, Northeastern suspended enforcement while the proceeding was active and resumed within weeks of Plaintiff's September 16, 2025 withdrawal. Following Plaintiff's November 2025 written notice to Defendant Estabrook, no corrective action was taken on any of the three identified tracks.

141. Defendant Estabrook, as Senior Vice Chancellor for Student Life, coordinated or ratified these adverse actions by: failing to correct known abuses of which she had direct written notice; rejecting disability protections by name in writing while acknowledging Plaintiff's documented medical needs; and directing or allowing every administrative system under her supervisory authority to be deployed against the same disabled student after the stated basis of each prior action had been contradicted by Northeastern's own institutional record.

142. These adverse actions would dissuade a reasonable person in Plaintiff's position from asserting disability rights or complaining about discriminatory conditions. For an F-1 student whose immigration status, housing, and academic standing are controlled by the same institution taking the adverse action, the coercive effect of each act is compounded by the immigration consequences that attach to every adverse academic or institutional action.

143. The causal connection between Plaintiff's protected activity and Defendants' adverse actions is established by highly suspicious temporal proximity. Defendants launched a coordinated five-

front escalation within four days of Plaintiff asserting her disability rights. Any non-retaliatory justification offered by Defendants is pretextual. The pretext is demonstrated by the fact that the disciplinary charges completely collapsed for lack of evidence upon adjudication, yet Defendants maintained the resulting registration block anyway. That sequence shows that the disciplinary apparatus was deployed as an instrument of retaliation rather than for legitimate conduct enforcement.

144. The pretextual character of the disciplinary proceedings is further established not by Plaintiff's inference but by Northeastern's own institutional record. A Vice Chancellor reporting to Defendant Estabrook reviewed Plaintiff's appeal, identified sixteen documented factual inaccuracies in the adjudicator's decision, and issued a formal written directive for reassignment of the matter. Defendants did not implement that directive. The sanction and registration block were maintained for more than 120 days after Plaintiff's exoneration on all serious charges and for more than 120 days after the Vice Chancellor's written directive to reassign.

145. An institution that maintains a disciplinary sanction its own appellate officer has documented as factually inaccurate is not enforcing policy. It is using the appearance of policy to obstruct a student who filed a civil rights complaint.

146. As a direct result of Defendants' adverse actions, Plaintiff suffered loss of housing, academic obstruction, registration blocks, post-eviction disciplinary threats, reputational harm, and additional physical and economic losses documented throughout the Facts.

147. Plaintiff seeks compensatory damages including for displacement and reputational injury; declaratory relief that Defendants' actions violated federal disability-retaliation protections and the Maine Human Rights Act; injunctive relief prohibiting further retaliation and requiring

removal of retaliatory notations and blocks from her records; and attorneys' fees and costs under 29 U.S.C. § 794a, 42 U.S.C. § 12205, and 5 M.R.S. § 4614. This action is timely, the last adverse act having occurred in January 2026.

**COUNT V**

**FAIR HOUSING ACT AND MAINE HUMAN RIGHTS ACT**

Disability Discrimination, Failure to Accommodate, and Retaliation

42 U.S.C. §§ 3604(f)(1), 3604(f)(3)(B), 3617; 5 M.R.S. §§ 4581-A, 4582, 4633

Against Defendant Northeastern University, NHR II Master Tenant LLC, Redfern Properties LLC, and Individual Defendants

148. Plaintiff incorporates by reference paragraphs 13-14, 28-29, 31-32, 46-61, 77-83.

149. The housing at 144 State Street, Unit 518, Portland, Maine, is a dwelling within the meaning of the Fair Housing Act, 42 U.S.C. § 3602(b), and the Maine Human Rights Act, 5 M.R.S. § 4581-A. Northeastern University, NHR II Master Tenant LLC, and Redfern Properties LLC each exercised control over, profited from, or enforced residential use of the property during the period at issue. Northeastern collected approximately $1,338 per month in housing payments, enforced housing policies, and conducted housing inspections. The substance of the housing relationship - not its label - determines Fair Housing Act coverage under 42 U.S.C. § 3602(b).

150. Plaintiff is a person with a disability within the meaning of 42 U.S.C. § 3604(f) and 5 M.R.S. § 4553-A, by virtue of her traumatic brain injury and related impairments documented by her treating providers.

151. Defendants had actual notice of Plaintiff's disability and need for accommodation no later than December 8, 2024, when Plaintiff provided written notice of her injury, disability status, and medical needs to Northeastern and property management, accompanied by graphic photographs documenting her physical incapacity. Defendants received three subsequent written medical directives in March, September, and December 2025 prescribing housing stability during neurological treatment. Defendant Chuprevich's written January 2025 accommodation grant confirms actual notice and feasibility.

152. Redfern Properties LLC's actual notice of Plaintiff's disability dates from December 8, 2024 - the date of Plaintiff's written injury notification and photographic documentation transmitted to housing management personnel exercising authority over the property Redfern managed. By the time Redfern executed the remote deactivation of Plaintiff's key-fob access on January 12, 2026, it had possessed documented knowledge of Plaintiff's traumatic brain injury and her neurologist's prescription against housing relocation for more than thirteen consecutive months.

153. Despite this notice, Defendants discriminated against Plaintiff in the terms, conditions, and privileges of rental and in the provision of services in connection with such housing, in violation of 42 U.S.C. § 3604(f)(1) and 5 M.R.S. §§ 4581-A, 4582. They placed and kept her in a windowless, non-compliant room measuring approximately 2.06 square feet of glazing, below Portland City Code requirements, despite immediate written objections. They refused a no-cost transfer to a vacant, light-filled room in the same unit after her injury and after her roommate vacated in February 2025. They denied or withdrew medically necessary housing accommodations after granting them in writing. They cut heat in winter in circumstances internal records confirm were not mechanical failure. They engaged in coercive, unannounced

entries on December 15, 22, and 23, 2025. They pursued extrajudicial eviction while two successive neurologist letters prescribing housing stability were in effect.

154. Defendants further failed and refused to make reasonable accommodations in rules, policies, practices, or services necessary to afford Plaintiff equal opportunity to use and enjoy her dwelling, in violation of 42 U.S.C. § 3604(f)(3)(B) and 5 M.R.S. § 4582. The requested accommodations were reasonable, would not have imposed undue burden, and were confirmed as feasible by Defendant Chuprevich's written January 2025 grant.

155. After Plaintiff requested these accommodations and reported habitability and utility violations to Portland Housing Code Enforcement, Defendants escalated eviction activity, utility shutoff, and lockout conduct. That escalation constitutes retaliation for protected conduct under 42 U.S.C. § 3617 and 5 M.R.S. §§ 4581-A, 4633.

156. The two-minute window between Defendants' January 12, 2026 physical entry into Plaintiff's unit and the remote deactivation of her key-fob access number 36222 documents real-time coordination among the named Defendants in furtherance of retaliatory removal. Redfern's execution of that deactivation was not the act of a neutral property manager implementing a landlord's instruction. Redfern had possessed actual knowledge of Plaintiff's disability since December 8, 2024 and detailed knowledge of her medical accommodation status since February 24, 2025. Its decision to execute the remote lockout at the precise moment Northeastern's agents were physically inside Plaintiff's unit - without judicial process, without a writ of possession, and with over more than twelve months of knowledge that Plaintiff's neurologist had prescribed housing stability as medically necessary - establishes Redfern as an independent knowing participant in the discriminatory and retaliatory housing conduct, not a passive instrument of Northeastern's direction.

157. Defendants accelerated this coordinated eviction activity within days of Portland Code Enforcement's December 21, 2025 remediation order documenting the habitability violations Plaintiff had reported since September 2024. They executed the lockout while that order remained outstanding and while Code Enforcement's investigation remained open. Reporting habitability violations to a municipal authority is protected conduct under 42 U.S.C. § 3617. Coordinated eviction activity timed to follow that report by days is retaliation on the face of the documentary record.

158. As a direct and proximate result of these discriminatory and retaliatory acts, Plaintiff suffered: sixteen months of premium rent paid for housing violating Portland City Code; loss of housing through extrajudicial eviction without judicial process; loss of proximity to coordinated neurological care at MaineHealth; seizure of prescription medications and academic materials without judicial process; heat deprivation in winter confirmed by internal records as non-mechanical; and physical deterioration documented at a February 25, 2026 medical visit.

159. Under the Fair Housing Act and the Maine Human Rights Act, Plaintiff seeks: (a) actual damages, including housing overcharges, displacement costs, and compensation for documented physical and psychological harm; (b) punitive damages against Northeastern and the housing Defendants pursuant to 42 U.S.C. § 3613(c); (c) civil penal damages under 5 M.R.S. § 4613(2)(B)(7); (d) declaratory and injunctive relief under 5 M.R.S. §§ 4613-4614; and (e) attorneys' fees and costs. This action is timely under 42 U.S.C. § 3613(a)(1)(A) and 5 M.R.S. § 4613(2)(C), the last discriminatory act having occurred on January 15, 2026.

**COUNT VI - UNLAWFUL SELF-HELP EVICTION**

14 M.R.S. § 6002 and Maine common law

Against Northeastern University, Redfern Properties LLC, and NHR II Master Tenant LLC

160. Defendants Northeastern University, Redfern Properties LLC, and NHR II Master Tenant LLC engaged in self-help eviction by cutting heat, deactivating Plaintiff's key-fob access, entering her dwelling without a court order, and removing her property, including prescription medications, while a court hearing and a Code Enforcement investigation were pending. Maine law prohibits self-help eviction and requires judicial process before a tenant may be removed. Defendants acted without that process and with actual knowledge of Plaintiff's disability and ongoing medical treatment. Plaintiff suffered loss of housing, disruption of medical treatment, and emotional and physical harm as a result.

**COUNT VII**

**UNLAWFUL DISCLOSURE OF EDUCATION RECORDS**

FERPA, 20 U.S.C. § 1232g; Maine Student Privacy Act, 20-A M.R.S. § 951 et seq.; Maine Common Law Invasion of Privacy

Against Defendant Northeastern University and Defendant Barry

161. Plaintiff incorporates by reference paragraphs 14, 25, 56, 77-83.

162. Plaintiff's educational and disability-related records - including information regarding her student status, disability and medical condition, housing accommodation status, and disciplinary matters - are education records within the meaning of the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, and student data within the meaning of the Maine Student Privacy Act, 20-A M.R.S. § 952(6).

163. On February 24, 2025, Defendant Barry disclosed Plaintiff's protected education records to a Property Manager for Redfern Properties LLC, who is not a Northeastern employee, not a school official, and not a person with a legitimate educational interest in Plaintiff's records within the meaning of 20 U.S.C. § 1232g(b)(1). Barry's own email documented this disclosure, stating she had informed Shrestha - adding: "not the University." That parenthetical is Defendant Barry's own acknowledgment that Shrestha was acting outside the institutional relationship that FERPA protects.

164. The disclosure was made without Plaintiff's consent, was not compelled by any court order or subpoena, and did not fall within any FERPA exception for disclosure to school officials with legitimate educational interests. No exception under 20 U.S.C. § 1232g(b) authorised it.

165. Property management personnel thereafter used the disclosed information to justify and advance eviction activity against Plaintiff despite actual notice of her disability and the neurologist's written prescription against housing relocation, directly contributing to the January 2026 extrajudicial lockout and property removal.

166. The unauthorised disclosure and downstream use of Plaintiff's education records additionally constitute invasion of privacy under Maine common law, specifically the tort of public disclosure of private facts and intrusion upon seclusion, by transmitting sensitive medical and disciplinary information about a disabled student to third-party personnel who then used it to facilitate her removal from housing.

167. Plaintiff seeks declaratory relief that the disclosure and use of her education records were unlawful under FERPA and the Maine Student Privacy Act. She seeks compensatory damages for invasion of privacy and all consequential injuries caused by the unauthorised disclosure,

including facilitation of the coordinated extrajudicial eviction. She seeks injunctive relief requiring destruction of improperly disclosed records and implementation of FERPA-compliant disclosure controls. She also seeks all equitable relief available under applicable federal and state law. This action is timely under 14 M.R.S. § 752, the disclosure having occurred on February 24, 2025.

**COUNT VIII**

**NEGLIGENCE - FAILURE TO DISBURSE CERTIFIED FUNDING**

Maine Common Law; 14 M.R.S. § 752

Against Defendant Northeastern University, Defendant Atwood, and Defendant Mallett

168. Plaintiff incorporates by reference paragraphs 13-14, 16, 22, 31-32, 33-45, 77-83.

169. Defendant Northeastern University, as Plaintiff's educational institution and F-1 visa sponsor, owed Plaintiff a duty of reasonable care to disburse funding it had certified on her federal immigration documents as verified and available. That certification - made by Northeastern's Designated School Officials under 8 C.F.R. § 214.3 - created a specific, documented, and foreseeable obligation running directly to Plaintiff. Defendant Atwood, as Director of Enrollment in charge of financial aid, and Defendant Mallett, as Chief Administrative Officer, each owed independent duties of reasonable care arising from their supervisory authority over the disbursement systems and their direct knowledge of the failure.

170. This duty arises independently of any contract because it is rooted in Northeastern's federal regulatory obligations as an SEVP-certified institution under 8 C.F.R. § 214.3 and as a Title IV financial aid administrator. A Designated School Official who certifies the accuracy of financial

information on a Form I-20 under federal regulatory obligation owes that duty to the student identified in the form, not only to a contractual counterparty.

171. Defendants' breach of these duties was the actual and proximate cause of Plaintiff's December 2, 2024 traumatic brain injury and the downstream physical, economic, and educational harm that followed. But for Northeastern's prolonged withholding of verified scholarship and loan funding, while it continued to bill for tuition, housing, and mandatory fees, Plaintiff would not have been subjected to nine consecutive months of severe food insecurity, malnutrition, and physical exhaustion. Plaintiff's treating hematologist first documented that this extended deprivation produced laboratory-confirmed iron-deficiency anemia and identified the cause as likely multifactorial, including decreased iron intake and other factors, and determined that she required intravenous iron after oral supplementation failed, with ongoing laboratory monitoring. That multi-system physiological collapse was not a transient deficit; it was a medically verified deterioration and it was the direct factual mechanism that led to Plaintiff's fall and traumatic brain injury in Northeastern-managed housing on December 2, 2024.

172. These harms were entirely foreseeable. Northeastern, as Plaintiff's educational institution, housing provider, and F-1 visa sponsor, controlled her academic standing, housing stability, and immigration status at the same time. It knew she was legally barred from off-campus employment. It knew it had not disbursed the certified funding it continued to represent as available on her federal immigration documents. It nevertheless continued to collect tuition, housing payments, and mandatory health-insurance premiums throughout the nondisbursement period. Withholding all approved funding from an international student who is legally confined to institutional support for an extended period, while retaining total control

over that student's status, makes a zone of danger involving severe malnutrition, physical exhaustion, medical emergency, and serious bodily harm not just foreseeable but predictable.

173. Defendants cannot limit their liability by claiming that the specific form of harm - a traumatic brain injury - was unforeseeable. Plaintiff's treating integrative-medicine physician documented that her post-concussive course was more prolonged than clinically expected because of the combination of head trauma from the fall and malnutrition and multiple stressors including housing instability, financial instability, and a four-hour daily commute. The malnutrition caused by Defendants' deprivation did not merely precede the injury; it extended and aggravated the recovery from it. Under the eggshell-skull doctrine, a negligent actor takes the plaintiff as they find her and may not rely on a physiological state they themselves created to reduce liability for the severity of the injury that state produced.

174. As a direct and proximate result of Defendants' negligence, Plaintiff suffered a traumatic brain injury confirmed by MRI imaging demonstrating bilateral frontal encephalomalacia and documented by her neurologist as producing ongoing post-concussive symptoms and measurable cognitive limitations. She also experienced a delay of roughly sixty days before coordinated neurological care began, more than twelve months of unreimbursed medical expenses across multiple treating disciplines while the designated campus-injury claim remained unprocessed; and additional student loan principal and interest incurred to survive the deprivation period, and compounded degree delay and professional loss tied to the resulting impairment. Plaintiff seeks compensatory damages for that full scope of harm and punitive damages under Maine law upon clear and convincing proof of implied malice as defined in Tuttle v. Raymond, based on Northeastern's documented knowledge of the nondisbursement,

its control over Plaintiff's ability to seek alternatives, and its decision to continue billing and refer her to collections rather than correct its own failure.

175. Defendants had actual knowledge of the disbursement failure and wrongful billing, had authority to correct them, and took no corrective action for 270 days while continuing to bill and collect charges from a student legally barred from working. Plaintiff seeks compensatory and punitive damages for the deprivation and the excess borrowing it forced, not merely for the $27,000 ultimately credited. This claim is timely under 14 M.R.S. § 752, the cause of action having accrued no earlier than January 8, 2024, when Northeastern transmitted the false scholarship certification through federal immigration systems.

**COUNT IX**

**NEGLIGENCE - FAILURE TO RESPOND TO CAMPUS INJURY**

Maine Common Law; 14 M.R.S. § 752

Against Defendant Northeastern University, Defendant Barry, and Defendant Chuprevich

176. Plaintiff incorporates by reference paragraphs 13-14, 17-20, 25, 31-32, 46-61, 77-83.

177. Defendant Northeastern University, as Plaintiff's housing provider and institutional sponsor, owed a duty of reasonable care to respond to a serious injury sustained by a student in its housing. Defendants Barry and Chuprevich owed independent duties of care arising from their administrative roles and their direct receipt of Plaintiff's December 8, 2024 injury notification and graphic photographs of her visible injuries and physical incapacity.

178. Northeastern voluntarily assumed this duty of care by: collecting mandatory health insurance premiums from Plaintiff throughout her enrollment; collecting mandatory student wellness fees advertised as funding emergency support, residential life coordination, and disability services; and deploying a residential infrastructure - including an on-site housing director who had publicly advertised regular drop-in hours - that Plaintiff and a reasonable person in her position would rely upon in the event of a serious injury. See Restatement (Second) of Torts § 324A.

179. Defendants breached those duties by: failing to conduct a welfare check following receipt of photographic documentation of Plaintiff's visible injuries; failing to facilitate medical referrals or care navigation for approximately sixty days; failing to activate any of the student support systems funded by Plaintiff's tuition and housing payments; and failing to process Plaintiff's insurance claim for thirteen consecutive months despite a designated adjuster and assigned claim number.

180. As a direct and proximate result of Defendants' negligence, Plaintiff suffered a sixty-day delay in coordinated neurological care, extending her critical recovery phase as documented by her treating primary-care physician. She incurred more than twelve months of unreimbursed medical expenses across six treating disciplines while a designated insurance claim sat unprocessed. She continues to experience neurological consequences of delayed treatment during the critical recovery window.

181. Plaintiff seeks compensatory damages for all medical expenses incurred during the period of insurance suppression, all consequential damages from delayed neurological care, and all damages arising from Defendants' failure to activate the support systems Plaintiff's payments funded. This action is timely under 14 M.R.S. § 752, the cause of action having accrued on December 2, 2024.

**COUNT X**

**FRAUD AND FRAUDULENT MISREPRESENTATION - SCHOLARSHIP AND FINANCIAL AID**

Maine Common Law; Fed. R. Civ. P. 9(b); 14 M.R.S. § 752

Against Defendant Northeastern University, Defendant Atwood, and Defendant Mallett

182. Plaintiff incorporates by reference paragraphs 13-14, 16, 22, 31-32, 33-45, 77-83.

183. Defendants made the following specific false representations of material fact, pleaded with particularity as required by Federal Rule of Civil Procedure 9(b).

184. Northeastern's Designated School Officials certified on Plaintiff's Form I-20 on January 8, 2024 that the Alfond Scholarship constituted verified, available funding sufficient to support Plaintiff's F-1 studies. That representation was false - the scholarship was not disbursed for 270 days - and was made to induce Plaintiff's continued enrollment and her university designated vendor loan application, both of which she completed in direct reliance on the certification. The four successive Form I-20 certifications verifying the Alfond Scholarship as currently available funding were false statements of present, existing fact - not unfulfilled future promises or administrative errors.

185. In November 2025, Northeastern claimed in writing for the first time that the Alfond Scholarship had been cancelled at the time of Plaintiff's campus transfer. That representation is directly contradicted by four successive Form I-20 certifications issued after the alleged cancellation date, each made under federal regulatory obligation pursuant to 8 C.F.R. § 214.3, each affirmatively certifying the scholarship as active and available. Both representations cannot

simultaneously be true. One was false when made. A DSO who certifies as presently available funding that the institution has internally cancelled makes a false statement of present fact under federal regulatory obligation.

186. Defendant Chuprevich represented to Plaintiff that her account had not been referred to collections. That representation was false when made. The account had been referred to collections. Plaintiff possesses documentary evidence confirming both the referral and the date on which it occurred.

187. Each representation was made with knowledge of its falsity or with reckless disregard for its truth, with intent that Plaintiff rely on it, and Plaintiff justifiably relied on each, suffering direct financial injury as a result.

188. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff enrolled and remained enrolled in reliance on funding Northeastern had certified to the federal government but then withheld for 270 days. She borrowed against the full cost of attendance rather than the net cost the Alfond Scholarship was intended to cover. She endured wrongful billing and collections activity ultimately reflected in a $27,000 institutional credit that arrived only after the deprivation, and credit harm had already occurred. As a direct and proximate result of Defendants' fraudulent misrepresentations, Plaintiff enrolled and remained enrolled in reliance on funding Northeastern had certified to the federal government but then withheld for 270 days. She borrowed against the full cost of attendance rather than the net cost the Alfond Scholarship was intended to cover. She endured wrongful billing and collections activity ultimately reflected in a $27,000 institutional credit that arrived only after the deprivation and credit harm had already occurred. Approximately $14,000 in repeat-course funding was applied to Plaintiff's account - demonstrating that Northeastern possessed both the administrative

mechanism and the institutional capacity to resolve the consequences of documented instructor misconduct, and chose to deploy that capacity to absorb the financial exposure rather than correct the academic record, leaving a false institutional narrative of academic deficiency where a finding of instructor misconduct should have been.

189. Plaintiff seeks compensatory and punitive damages for these losses. Punitive damages are available under Maine common law on the ground that Defendants' deliberate misrepresentation in federal immigration documents constitutes implied malice within the meaning of Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985). Plaintiff also seeks all equitable relief available under applicable law. This action is timely under 14 M.R.S. § 752, the cause of action having accrued on January 8, 2024.

**COUNT XI**

**FRAUD AND FRAUDULENT MISREPRESENTATION - INSURANCE CLAIM HANDLING**

Maine Common Law; Fed. R. Civ. P. 9(b); 14 M.R.S. § 752

Against Defendant Northeastern University

190. Plaintiff incorporates by reference paragraphs 13-14, 31-32, 42-45, 46-50, 77-83.

191. Following Plaintiff's December 2, 2024 traumatic brain injury in university housing, a housing director represented to Plaintiff that her injury claim would be handled through Northeastern's insurance systems. On February 24, 2025, Redfern's insurance company confirmed in writing that pursuant to the lease contract with Northeastern, they would be the party to handle the claim. It assigned a claim number to Northeastern adjuster. That assignment - on a specific

date, through a specific named adjuster - created a documented expectation that Plaintiff's medical expenses would be processed and paid.

192. Those representations were false or made with reckless disregard for their truth. No substantive claim processing occurred for at least thirteen consecutive months. Plaintiff sent repeated written communications and calls to adjuster Mayes. No substantive response was provided. Throughout this period, Northeastern continued collecting mandatory health insurance premiums and housing fees.

193. Defendants made these representations with intent that Plaintiff rely on them by delaying pursuit of alternative coverage, continuing to pay mandatory premiums, and incurring out-of-pocket medical expenses with the expectation of reimbursement. Plaintiff justifiably relied on these representations and suffered direct financial injury as a result.

194. As a direct and proximate result, Plaintiff suffered at least more than twelve months of unreimbursed medical expenses across six treating disciplines. Financial pressure from that suppression affected the extent of medical treatment she could pursue during the critical recovery phase.

195. Plaintiff seeks compensatory damages for all unreimbursed medical expenses and consequential damages. She seeks punitive damages under Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985), on the ground that coordinated suppression of a documented injury claim while continuing to collect premiums constitutes implied malice. She also seeks all equitable relief available under applicable law. This action is timely under 14 M.R.S. § 752, the cause of action having accrued on February 24, 2025.

**COUNT XII**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Maine Common Law; Restatement (Second) of Torts § 46; 14 M.R.S. § 752

Against Defendant Northeastern University, Defendant Estabrook, Defendant Chuprevich, Defendant Barry, Defendant O'Neil SanFilippo, and Defendant McGrath

196. Plaintiff incorporates by reference paragraphs 15, 17-20, 25-27, 31-32, 33-76, 77-83.

197. Under Maine law, a Defendant is liable for intentional infliction of emotional distress when: (a) the Defendant intentionally or recklessly inflicts severe emotional distress, or knows or should know such distress is substantially certain to result from the conduct; (b) the conduct is so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilised community; and (c) the conduct causes severe emotional distress.

198. Defendants, acting individually and in concert, intentionally and recklessly engaged in a sustained course of conduct toward Plaintiff that they knew or should have known was substantially certain to cause severe emotional distress. Plaintiff was a brain-injured, financially dependent international student. Her immigration status, housing, and education were simultaneously under Defendants' control. Northeastern's concurrent authority over Plaintiff's academic standing, housing, and F-1 visa sponsorship made the coercive effect of each act uniquely severe and foreseeable.

199. This conduct includes, without limitation, the following. Defendants withheld approved funding for 270 days while pressuring Plaintiff to take on additional institutional debt under

immigration threat. They placed her in a windowless, substandard room and refused transfer after her traumatic brain injury. They failed to deploy any welfare, wellness, or support response after receiving graphic photographs documenting her injuries. They denied medically supported disability and housing accommodations and then used those denials as the stated basis for eviction. They cut heat in winter in circumstances confirmed as non-mechanical. They initiated and maintained baseless disciplinary proceedings that collapsed under scrutiny while preserving an irrational sanction and a 120-day registration block. They executed an extrajudicial lockout and removed Plaintiff's belongings and prescription medications without a court order.

200. Defendant Estabrook supervised every administrative system deployed against Plaintiff - disability accommodation, housing enforcement, and student conduct - during the same period. She coordinated or ratified the actions of Defendants Droz, Chuprevich, Barry, O'Neil SanFilippo, and McGrath. She rejected disability law by name in writing while acknowledging Plaintiff's documented medical needs. She threatened further disciplinary proceedings after the eviction was complete.

201. This pattern of conduct, directed at a disabled student known to be in active neurological treatment and legally barred from alternative employment or housing, is so extreme and outrageous as to exceed all possible bounds of decency and is utterly intolerable in a civilised community.

202. As a direct and proximate result, Plaintiff suffered severe emotional distress. That distress includes anxiety, fear, humiliation, and sleep disturbance, as documented by her treating counsellor. She experienced physical deterioration and weight loss of approximately fifteen pounds, documented at a February 25, 2026 medical visit. She also suffered cognitive impact on neurological recovery as documented by treating physicians.

203. Defendants' conduct was intentional, wilful, and constitutes implied malice within the meaning of Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985). Plaintiff seeks compensatory damages for severe emotional distress and all physical and cognitive consequences of Defendants' conduct, and punitive damages. This action is timely under 14 M.R.S. § 752, the last act having occurred in January 2026.

**COUNT XIV**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

Maine Common Law; 14 M.R.S. § 752

Against Defendant Northeastern University - In the Alternative to Count XI

204. Plaintiff incorporates by reference paragraphs 31-76, 77-83. This Count is pleaded in the alternative to Count XI. It is included to preserve all available theories in the event the Court finds any element of intentional or reckless infliction not established at the pleading stage.

205. Defendants owed Plaintiff a duty of reasonable care to avoid causing foreseeable emotional distress arising from their roles as her housing provider, educational institution, and F-1 visa sponsor. The structural power imbalance created by Northeastern's simultaneous control of Plaintiff's housing, academic standing, and immigration sponsorship made emotional distress from institutional misconduct foreseeable.

206. Defendants breached this duty through negligent conduct. They failed to maintain habitable housing conditions. They failed to provide timely medical referrals after Plaintiff's traumatic brain injury. They mishandled Plaintiff's insurance claim for thirteen consecutive months. They

evicted Plaintiff during active neurological recovery through extrajudicial process. They seized her medications and property without lawful process.

207. As a direct and proximate result of Defendants' negligent conduct, Plaintiff suffered severe emotional distress, anxiety, trauma response, and psychological harm documented by her treating counsellor. Plaintiff seeks compensatory damages for emotional distress and all consequential damages. This action is timely under 14 M.R.S. § 752.

**COUNT XV**

**INVASION OF PRIVACY - INTRUSION UPON SECLUSION**

Maine Common Law; 14 M.R.S. § 752

Against Defendant Northeastern University, NHR II Master Tenant LLC, Redfern Properties LLC, and Individual Defendants

208. Plaintiff incorporates by reference paragraphs 17- 20, 25, 28- 29, 31- 32, 54- 60, 77- 83.

209. Under Maine common law, a Defendant is liable for intrusion upon seclusion where the Defendant intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or her private affairs, in a manner that would be highly offensive to a reasonable person.

210. Plaintiff's dwelling at 144 State Street, Unit 518, and her person, belongings, and medical condition within that dwelling, constituted a private space and private affairs into which she had a reasonable expectation of seclusion.

211. Defendants' repeated physical entries into Plaintiff's unit, deactivation of her key-fob access, and persistent unannounced appearances were not legitimate maintenance activities or

emergency interventions. They were deliberate, coercive intrusions designed to circumvent the judicial eviction process - to achieve through physical pressure and utility deprivation what Defendants could not achieve through lawful judicial means.

212. No court had issued a writ of possession. No eviction order existed. A TRO hearing Plaintiff had initiated on January 2, 2026 was scheduled for January 26, 2026 to review that precise conduct. The timing of the entries is independently significant. They were accelerated following Portland Code Enforcement's December 21, 2025 remediation order documenting the habitability violations Plaintiff had reported since September 2024. Defendants' response to municipal validation of Plaintiff's complaints was not remediation. It was removal.

213. Defendants intentionally intruded upon Plaintiff's seclusion through the following acts. On December 15, 22, and 23, 2025, they entered her dwelling without adequate notice, consent, or emergency justification. They appeared repeatedly at her door in the wake of utility shutoffs and code complaints. On January 12, 2026, they entered her dwelling with a master key without consent or court order, while simultaneously coordinating the remote deactivation of key-fob access number 36222 - a two-minute window documented in electronic access records - as Plaintiff remained a lawful occupant. On January 14, 2026, they entered her dwelling to pack and remove her personal belongings, including prescription medications, devices, and academic materials, without judicial process.

214. These intrusions occurred as part of a pattern of coercive access tied to eviction pressure and retaliation for Plaintiff's assertion of her legal rights. At the time, Defendants knew she was medically vulnerable and under written instructions from her treating neurologist to minimise cognitive stress and environmental destabilisation.

215. Entering a brain-injured student's private dwelling without notice, cutting access to heat and building entry, and remotely disabling her key-fob at the precise moment Defendants' agents were physically inside the unit are intrusions that would be highly offensive to a reasonable person. They are compounded when directed at a person whose neurologist had prescribed minimisation of environmental destabilisation as part of her active recovery protocol.

216. As a direct and proximate result of these intrusions, Plaintiff suffered emotional distress, loss of sense of safety in her home, disruption of neurological recovery, and damage to and loss of personal, medical, and academic property.

217. Plaintiff seeks compensatory damages for the invasion of her privacy and all resulting harms, together with punitive damages against those Defendants whose conduct reflects implied malice within the meaning of Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985). This action is timely under 14 M.R.S. § 752, the last intrusion having occurred on January 14, 2026.

**COUNT XVI**

**DEFAMATION**

Maine Common Law; 14 M.R.S. § 753

Against Defendant Northeastern University, Defendant Barry, Defendant Chuprevich, Defendant O'Neil SanFilippo, and Defendant McGrath

218. Plaintiff incorporates by reference paragraphs 17- 20, 25- 27, 31- 32, 67- 76, 77- 83.

219. Under Maine law, defamation requires a false statement of fact, publication to a third party, fault, and harm to reputation. Plaintiff is a private figure. Defendants need only have acted negligently as to the truth of the statements to establish liability. The statements described

herein were made with actual knowledge of their falsity or reckless disregard for their truth. That standard satisfies any applicable fault threshold and establishes the actual malice required for punitive damages.

220. Defendants published false statements of fact to third parties characterising Plaintiff as dangerous and armed, including to law enforcement, internal university authorities, and the private property management company administering 144 State Street. Those statements were based on photographs of ordinary kitchen utensils obtained approximately ten days before the alleged incident they were used to support, in circumstances where Defendants concurrently possessed Plaintiff's December 8, 2024 injury photographs documenting her visible wounds and physical incapacity.

221. The photographs used to build the dangerous-and-armed narrative were taken by the same person who had transmitted graphic photographs of Plaintiff's visible injuries to housing officials on December 8, 2024. Housing officials therefore possessed, before circulating the threat narrative, photographic documentation of Plaintiff's physical incapacity from her neurologist-confirmed traumatic brain injury. They also possessed, from the same source, photographs of kitchen utensils used to construct the threat characterisation. Publishing that Plaintiff was dangerous and armed while holding photographic documentation of her physical incapacity constitutes actual malice within the meaning of applicable Maine defamation law. Qualified privilege does not survive publication made with actual knowledge of its falsity.

222. Defendants Barry and Chuprevich fabricated and maintained a disciplinary record characterising Plaintiff as responsible for conduct that Defendant Sanfillippo found did not occur. That record was published internally within Northeastern's systems. A Vice Chancellor reporting to Defendant Estabrook identified sixteen documented factual inaccuracies in the

adjudicator's decision and issued a written directive for reassignment. The directive was not implemented. The false record was maintained for more than 120 days after exoneration.

223. As a direct and proximate result of Defendants' defamatory statements, Plaintiff suffered reputational harm from the publication of false characterisations to law enforcement and third-party property management personnel. She suffered reputational harm from the internal publication of a false disciplinary record maintained despite exoneration and a senior officer's written correction of sixteen factual inaccuracies. She continues to suffer harm from the existence of that record in Northeastern's institutional systems.

224. Plaintiff seeks compensatory and punitive damages under Maine common law for defamation, including damages for reputational harm, interference with academic and career opportunities, and emotional distress. Punitive damages are available upon clear and convincing proof of actual malice. That standard is met here. Defendants possessed graphic photographic documentation of Plaintiff's physical incapacity before circulating the dangerous-and-armed narrative. They maintained a disciplinary record their own appellate officer documented as containing sixteen factual inaccuracies. Plaintiff additionally seeks equitable relief including an order requiring expungement of the false disciplinary record from Northeastern's systems. This action is timely under 14 M.R.S. § 753, the two-year limitations period running separately from each publication, the most recent having occurred in January 2026.

**COUNT XVII**

**CONVERSION AND TRESPASS TO CHATTELS**

Maine Common Law; 14 M.R.S. § 752; 14 M.R.S. § 6002

Against Defendant Northeastern University, Defendant Barry, and Defendant Chuprevich

225. Plaintiff incorporates by reference paragraphs 17-20, 25, 31-32, 58-60, 77-83.

226. On January 14, 2026, Defendants Chuprevich and Dorcus, along with contractors under their direction, entered Plaintiff's dwelling and removed her personal property without judicial process, without a court order, without a writ of possession, and without Plaintiff's consent. The property removed included refrigerated prescription medications prescribed for active traumatic brain injury recovery, additional prescription medications, academic devices and materials, personal documents, jewelry, clothing, and perishable food rendered worthless by the period of inaccessibility. Plaintiff was present. She objected to the removal and recorded it on video. No judicial eviction order had been obtained from any court.

227. Maine law, 14 M.R.S. § 6002, prohibits self-help eviction and the removal of a tenant's possessions without judicial process. Defendants had no authority to remove Plaintiff's property without a court order regardless of any claimed right to the underlying premises.

228. Defendants intentionally exercised dominion and control over Plaintiff's personal property in a manner wholly inconsistent with her ownership rights. No court had authorised the removal. No writ of possession had been issued. Under Maine law, an intentional exercise of dominion over another's property without authority constitutes conversion regardless of whether the actor claims a right to the underlying premises.

229. Defendant Chuprevich subsequently represented in writing that Plaintiff had been given access to all her medications. Plaintiff documented in writing at 1:59 PM on January 14, 2026 that the representation was false and that she had video evidence contradicting it. The bag handed to Plaintiff contained an iPad, a notepad, and painkillers. It did not contain the prescription medications Chuprevich's written communication claimed had been provided. The seizure of

prescription medications necessary for traumatic brain injury treatment, followed by a false written representation that they had been provided, constitutes conversion of property essential to Plaintiff's medical treatment. It reflects reckless disregard for Plaintiff's physical safety that constitutes implied malice within the meaning of Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985).

230. As a direct and proximate result of Defendants' conversion and trespass to chattels, Plaintiff suffered the following losses. She lost prescription medications necessary for traumatic brain injury treatment, including refrigerated medications destroyed by overnight exposure in winter conditions. She lost academic devices and materials required for ongoing coursework and thesis. She lost perishable food rendered worthless during the lockout period. She lost personal documents and jewelry. Her traumatic brain injury treatment was interrupted.

231. Plaintiff seeks compensatory damages for the value of all converted property, consequential damages for disruption of medical treatment, punitive damages, and return or replacement value of all property not returned. This action is timely under 14 M.R.S. § 752, the cause of action having accrued on January 14, 2026.

**COUNT XX**

**ACADEMIC INTERFERENCE AND RETALIATORY GRADING**

Maine Common Law; Breach of Implied Contract; 14 M.R.S. § 752

Against Defendant Northeastern University and Defendant Domino

232. Plaintiff incorporates by reference paragraphs 13-14, 23-24, 31-32, 62-66, 77-83.

233. Defendant Domino, as a Northeastern instructor, owed Plaintiff a professional and contractual duty to evaluate her academic work fairly, on the basis of academic merit, and without reference

to non-academic factors. Northeastern, as the institution that assigned Domino to a graduate course and collected graduate tuition from Plaintiff for that instruction, owed an independent duty to ensure that assignment was performed by an instructor with appropriate credentials and that grading misconduct was corrected when reported.

234. Approximately six weeks before the end of the Spring 2024 term, Defendant Domino told Plaintiff to "prepare to fail" in the presence of Defendant Gill. Domino subsequently refused to grade Plaintiff's submitted coursework and issued a failing outcome. Plaintiff passed CS5002 satisfactorily in the same term. Northeastern's Office of General Counsel received written notice of this conduct in May 2024 and took no corrective action. Defendant Gill issued Plaintiff with repeat-course funding rather than reporting the misconduct she had witnessed. That funding was not disclosed to Plaintiff as a mechanism distinct from ordinary financial aid.

235. As a direct and proximate result of Defendant Domino's retaliatory grading and Northeastern's failure to correct it, Plaintiff suffered the following harms. She lost Spring 2024 semester academic credit for work submitted and completed. She incurred approximately $14,000 in undisclosed repeat-course funding that created a false institutional record of academic deficiency rather than correcting documented instructor misconduct. Her normal degree progression was delayed by nine months at the outset. That initial delay compounded into cumulative thesis delay and lost professional opportunities that flowed directly from the engineered academic obstruction.

236. Plaintiff seeks compensatory damages including the value of lost educational time and opportunity, tuition expenses for the course retake, and the financial equivalent of the nine-month degree delay calculated against Plaintiff's documented professional trajectory and

earning capacity. She also seeks all consequential damages. This action is timely under 14 M.R.S. § 752, the cause of action having accrued in Spring 2024.

**COUNT XXI**

**CIVIL CONSPIRACY**

Maine Common Law; 14 M.R.S. § 752

Against Individual Northeastern Defendants, Redfern Properties LLC, and NHR II Master Tenant LLC

237. Plaintiff incorporates by reference 13- 21, 23- 39, 44- 77, and 84- 91.

238. Under Maine common law, civil conspiracy requires: (1) two or more persons; (2) acting in concert pursuant to a common design; (3) to commit an unlawful act or a lawful act by unlawful means; (4) resulting in damage to the plaintiff.

239. The individual Defendants - Estabrook, Chuprevich, Barry, Droz, O'Neil SanFilippo, McGrath, Atwood, Mallett, Domino, and Gill - acted in concert pursuant to a common plan. That plan was to remove Plaintiff from Northeastern's housing and institutional relationship in the period following her December 2, 2024 traumatic brain injury. The conspiracy was implemented through a series of coordinated acts, each of which furthered the common purpose of concealing institutional liability for that injury and suppressing Plaintiff's ability to establish that liability through legal proceedings.

240. The common plan is evidenced by: the coordination of five adverse institutional actions within four days of each other in March 2025; the two-minute window between Defendant

Chuprevich's entry into Plaintiff's unit and the remote electronic key-fob deactivation executed by property management personnel on January 12, 2026, documented in electronic access records; Defendant Barry's transmission of Plaintiff's protected educational and medical records to property management personnel on February 24, 2025; and Defendant Estabrook's supervisory coordination of disability accommodation, housing enforcement, and disciplinary systems against the same student in the same period, each maintained after its stated basis had been contradicted by Northeastern's own institutional record.

241. (a) False scholarship certification. Northeastern transmitted to the Department of Homeland Security a Form I-20 certifying Plaintiff's Alfond Scholarship as verified and available on January 8, 2024, while knowing or recklessly disregarding that the scholarship had not been and would not be disbursed. This false certification induced Plaintiff to remain enrolled and dependent on Northeastern's institutional support, foreclosing her ability to seek alternative funding or legal recourse during the 270-day deprivation period that caused her physical deterioration and ultimately her December 2, 2024 injury. After the scholarship's alleged internal cancellation - for which Northeastern has produced no contemporaneous written documentation - Northeastern's Designated School Officials issued four successive Forms I-20 to the Department of Homeland Security, each certifying the cancelled scholarship as active, verified, and available.

242. (b) Insurance suppression. Following the December 2, 2024 injury, Northeastern coordinated with Redfern to assign claim to a named adjuster while ensuring that no substantive processing occurred for thirteen consecutive months. The assignment of a claim number and a named adjuster created the appearance of compliance. The more than twelve months of non-response ensured that appearance never became reality. Premiums were collected throughout.

243. (c) Fabricated disciplinary proceedings. When accommodation denial alone failed to remove Plaintiff from housing, Defendants O'Neil SanFilippo and McGrath, under the supervisory authority of Defendant Estabrook, initiated disciplinary charges whose pretextual origin is evidenced by communications showing that Plaintiff's then-roommate was instructed to photograph Plaintiff's kitchen utensils approximately ten days before the alleged incident. These charges were coordinated with housing enforcement to create a parallel removal mechanism and a false institutional narrative characterising Plaintiff as a dangerous student rather than a disabled one asserting legal rights. The charges collapsed. The registration block maintained for 120 days after exoneration served the conspiracy's purpose regardless of whether the underlying charges survived.

244. (d) Unauthorised disclosure of confidential records to Redfern. Defendant Barry disclosed Plaintiff's disability status, medical condition, student status, and disciplinary matters to Redfern Properties LLC personnel without Plaintiff's consent and without legitimate educational purpose. This disclosure armed Redfern with the information necessary to characterise its participation in the eviction as responsive to documented institutional concerns rather than as an independent violation of fair housing law.

245. (e) Coordinated physical enforcement by Redfern. Redfern Properties LLC, with full knowledge of Plaintiff's disability, the absence of any court order, and the pendency of Portland Code Enforcement's investigation, executed the physical components of the eviction. Those components - access deactivation, master key entry, overnight lockout, and property removal - were acts Northeastern could not perform directly without further exposing its administrative actors to personal liability. Redfern is a professional property management company. Its knowledge of 14 M.R.S. § 6002's prohibition on self-help eviction is not a matter of inference. It is a matter of professional obligation. Redfern's participation was not passive compliance

with a client instruction. It was the knowing contribution of physical enforcement capability to a scheme whose legal exposure Redfern's own industry knowledge required it to recognise and refuse.

246. (f) Eviction timed to obstruct municipal investigation. The January 12-14, 2026 eviction was executed twenty-four days after Portland Code Enforcement issued a December 21, 2025 remediation order documenting the habitability violations Plaintiff had reported since September 2024. Plaintiff filed a follow-up Code Enforcement complaint on January 12, 2026 - the same day the lockout sequence began. She was removed from the premises before the investigation that would have fully documented those conditions could conclude. The primary witness to the conditions that caused the injury was removed by the parties with the greatest institutional interest in those conditions remaining undocumented.

247. Defendants accelerated the January 12-14 lockout and property removal after receiving notice of Plaintiff's January 2, 2026 TRO filing and pending January 26, 2026 court hearing. They completed the physical eviction before the Court could review it. Proceeding to physical eviction ten days after receiving notice of a pending judicial hearing on precisely that conduct - rather than awaiting judicial determination - constitutes an overt act in furtherance of the conspiracy evidencing consciousness of wrongdoing.

248. Each individual Defendant had knowledge of the common plan, participated in its execution, and took overt acts in furtherance of it as documented in the Factual Allegations. The plan caused each of the injuries documented throughout this Complaint.

249. Plaintiff seeks compensatory damages against all individual Defendants jointly and severally for all injuries caused by the civil conspiracy. She seeks punitive damages against each individual

Defendant within the meaning of Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985), and all equitable relief available. This action is timely under 14 M.R.S. § 752, the overt acts in furtherance of the conspiracy having continued through January 2026.

**COUNT XXII - KNOWING FAILURE TO PREVENT CIVIL-RIGHTS CONSPIRACY**

42 U.S.C. § 1986

Against Defendant NHR II Master Tenant LLC

250. Plaintiff incorporates by reference 18- 21, 36- 37, and 68- 77.

251. NHR II Master Tenant LLC had actual knowledge, no later than December 8, 2024, of the coordinated scheme to remove Plaintiff from housing through extrajudicial means while she was under active neurological treatment. As master leaseholder at 144 State Street, NHR II held both the authority and the legal obligation to halt the January 2026 extrajudicial lockout and property removal. It possessed that authority at the moment its agents and Northeastern's agents executed the January 12- 14, 2026 removal while a Code Enforcement investigation remained open on the same premises. It did not act. Section 1986 imposes liability on any person who, having knowledge that wrongs conspired to be done under § 1985 are about to be committed and having power to prevent or aid in preventing their commission, neglects or refuses to do so. NHR II satisfies each of those elements.

**COUNT XXIII**

**VIOLATION OF 42 U.S.C. § 1985(3) - CIVIL RIGHTS CONSPIRACY**

42 U.S.C. § 1985(3); 42 U.S.C. § 1988

Against All Defendants

252. Plaintiff incorporates by reference 13- 21, 23- 39, 44- 77, and 84- 91.

253. Section 1985(3) prohibits two or more persons from conspiring to deprive any person of the equal protection of the laws or of equal privileges and immunities under the laws, where the conspiracy is motivated by class-based discriminatory animus. Griffin v. Breckenridge, 403 U.S. 88 (1971).

254. Defendants conspired to deprive Plaintiff of rights guaranteed under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Fair Housing Act.

255. The class-based discriminatory animus required under Griffin is established by Defendant Estabrook's January 15, 2026 written statement: "I confirm that you have no entitlement to reside in Roux Institute student housing based on landlord/tenant law, disability law, or otherwise." That statement is direct documentary evidence that the conspiracy was motivated by animus toward Plaintiff's status as a disabled person asserting disability law protections. Disability status has been recognised as a protected class within the scope of § 1985(3) by multiple circuits. Plaintiff invokes this Count on that basis while acknowledging that First Circuit authority on this specific question remains developing.

256. Defendants executed the physical lockout on January 12, 2026 - ten days after Plaintiff filed a TRO motion in Cumberland County Superior Court and ten days before the scheduled January 26, 2026 hearing. All named Defendants had actual or constructive notice of the pending proceeding at the time of the lockout. That timing constitutes an additional overt act in furtherance of the civil rights conspiracy and independent evidence of consciousness of guilt. Redfern Properties LLC executed the remote key-fob deactivation with over more than twelve

months of documented knowledge of Plaintiff's disability. That conduct establishes Redfern's participation in the conspiracy as a knowing actor, not a passive instrument.

257. Each Defendant took overt acts in furtherance of the conspiracy as documented in the Factual Allegations. The conspiracy caused each of the injuries documented throughout this Complaint.

258. Plaintiff seeks compensatory damages for all injuries caused by the civil rights conspiracy, punitive damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 1985 and 42 U.S.C. § 1988. This action is timely, the last overt act in furtherance of the conspiracy having occurred in January 2026.

**COUNT XXIV - UNJUST ENRICHMENT**

Against Northeastern University, Redfern Properties LLC, and NHR II Master Tenant LLC

259. Plaintiff incorporates by reference 2- 7, 44- 56, and 68- 77.

260. Plaintiff conferred substantial economic benefits on Defendants, including payment of approximately $1,338 per month for sixteen months for a unit that violated municipal habitability standards, mandatory health-insurance premiums for a campus-injury policy whose benefits were suppressed, and mandatory wellness and student-services fees for emergency support systems that were never activated when she sustained a documented traumatic brain injury in university housing. Defendants accepted and retained those payments while failing to provide the promised benefits and, in some cases, actively concealing violations from Plaintiff and from municipal authorities. Under these circumstances, it would be inequitable for Defendants to retain the value of those payments without restitution.

**COUNT XXV**

**INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE ECONOMIC ADVANTAGE; GRADUATION DELAY AND PROSPECTIVE ECONOMIC LOSS**

Maine Common Law; 14 M.R.S. § 752

Against Defendant Northeastern University, Defendant Estabrook, Defendant O'Neil SanFilippo, Defendant McGrath, Defendant Chuprevich, Defendant Barry and Defendant Domino.

261. Plaintiff incorporates by reference 13- 21, 23- 27, 68- 77, 78- 80, 89- 93, and 95- 103.

262. Plaintiff was expected to begin substantial thesis and capstone work and prepare for graduation in Spring 2026, including participation in conferences, research collaborations, and recruitment opportunities aligned with an on-time graduation timeline in artificial intelligence governance and multilingual natural language processing - a field in which Plaintiff holds prior professional credentials, active UN engagement, and developed intellectual property.

263. Defendants' coordinated actions directly interfered with Plaintiff's ability to register for courses, access faculty supervision, and complete required thesis or capstone milestones. The specific acts of interference include: the maintenance of a baseless OSCCR sanction and resulting registration block after exoneration and after a Vice Chancellor's written directive to reassign the matter; the January 2026 eviction during an active academic semester; the seizure and removal of Plaintiff's academic devices and materials without judicial process; and the denial of medically necessary housing stability during the critical thesis-commencement period.

264. Defendants knew or should have known that obstructing Plaintiff's registration, evicting her during an active semester, and removing her academic materials would foreseeably disrupt her thesis work and degree completion, causing long-term professional and economic harm. A Vice Chancellor reporting to Defendant Estabrook had identified the registration block as factually unsupported and issued a written directive for its removal. Defendants maintained it for more than 120 days after that directive. The foreseeability of thesis disruption from a registration block is not inferential. It is the mechanical function of a registration block.

265. As a direct result, Plaintiff was unable to progress on her thesis or capstone project during the Spring 2026 semester. She was forced to delay her expected graduation date. She lost opportunities for conference presentations, recruiting cycles, fellowships, and early-career roles closely tied to timely graduation in her field.

266. The graduation delay did not originate in January 2026. Its origin is Spring 2024, when Defendant Domino's retaliatory grading caused a nine-month disruption to Plaintiff's normal degree progression. That initial delay compressed every subsequent academic milestone, reducing Plaintiff's margin for recovery from the institutional obstructions that followed. The coordinated acts of Defendants O'Neil SanFilippo, McGrath, Chuprevich, Barry, and Estabrook in 2025 and 2026 operated on a timeline Defendant Domino had already damaged. The cumulative graduation delay this Count addresses is the direct and foreseeable result of both the initial academic obstruction and the subsequent institutional interference taken together.

267. The professional windows this sequence closed are time-sensitive and non-recoverable. A researcher in artificial intelligence governance who cannot present work at the moment it is current cannot enter the job market at the moment her cohort is recruiting. She cannot

participate in academic networks at the moment relationships form. The value lost during those windows is not restored by later graduation.

268. Plaintiff has suffered and will continue to suffer prospective economic losses. Those losses include delayed entry into the workforce at a graduate-level salary, calculated at the difference between graduate-level compensation and current earnings for the period of delay. They include reduced competitiveness for fellowships, research roles, and senior positions whose availability is tied to career stage rather than absolute qualification. They include reputational harm in academic and professional networks from the forced interruption of her thesis trajectory. They include lost opportunities for conference presentations, research collaborations, and professional advancement that are non-recoverable.

269. Plaintiff seeks compensatory and consequential damages under Maine common law for intentional interference with contractual relations and prospective economic advantage. Those damages include: (a) damages for delayed graduation calculated at the difference between graduate-level and current earnings for the delay period; (b) damages for lost professional opportunities including conference presentations, research collaborations, and recruiting opportunities; (c) consequential damages for prospective economic loss including reduced lifetime earning capacity as quantified by Plaintiff's retained expert witness under Rule 26(a)(2); and (d) equitable relief requiring Defendants to remove all registration blocks, restore Plaintiff's academic standing, and provide such accommodations as are necessary to enable Plaintiff to complete her thesis on a fair, non-retaliatory basis.

270. This action is timely under 14 M.R.S. § 752, the cause of action having accrued on January 12, 2026, when the combined effect of the registration block, eviction, and academic material seizure directly prevented Spring 2026 thesis commencement.

## VI. RELIEF AND REMEDIES

i. Compensatory damages in amounts to be established at trial for all economic losses, unreimbursed medical expenses, excess loan principal and interest, housing overcharges, lost educational opportunity, and lost professional opportunities whose time-sensitive nature makes them non-recoverable; past lost earnings from the date of expected graduation through trial, calculated at the graduate-level compensation Plaintiff would have received had Defendants not obstructed her degree completion; and future lost earnings calculated as the reduction in Plaintiff's lifetime earning trajectory attributable to Defendants' conduct, as established by documentary evidence of Plaintiff's professional baseline, Bureau of Labor Statistics occupational wage data for computer science and artificial intelligence roles, and reasonable inference - the burden of any imprecision in that calculation falling on Defendants whose own conduct created it. Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 265 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931).

ii. Compensatory damages for severe emotional distress and documented psychological harm as established by treating providers;

iii. Punitive damages against all Defendants whose conduct was intentional, wilful, and malicious within the meaning of Tuttle v. Raymond, 494 A.2d 1353 (Me. 1985), and against all Defendants whose conduct satisfies the malice or reckless indifference standard under 5 M.R.S. § 4613(2)(B)(7)(c), and against all Defendants in the federal civil rights conspiracy counts under 42 U.S.C. § 1985;

iv. Civil penal damages pursuant to 5 M.R.S. § 4613(2)(B)(7) up to the statutory maximum;

v. Declaratory relief establishing that Defendants violated Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, the Fair Housing Act, the Maine Human Rights Act, FERPA, the Maine Student Privacy Act, and applicable Maine common law;

vi. Injunctive relief requiring: (i) immediate correction of Plaintiff's academic, financial, immigration, housing, and disciplinary records, including removal of any entries reflecting cancellation of the Alfond Scholarship, referral to collections, or adverse conduct findings; (ii) removal of all registration blocks and disciplinary notations from Plaintiff's institutional records; (iii) implementation of Section 504- and ADA-compliant disability accommodation procedures; (iv) restoration of Plaintiff's enrollment status and academic standing; (v) implementation of FERPA-compliant disclosure controls and destruction of education records improperly disclosed to third parties; (vi) expungement of the false disciplinary record and the defamatory dangerous-and-armed narrative from Northeastern's internal systems and partner databases; (vii) issuance of a written corrective statement on Northeastern University letterhead, signed by a senior academic officer, confirming that Plaintiff is in good academic and conduct standing, that all prior disciplinary characterizations and threat-related findings have been withdrawn as unsupported by the evidence, and that Plaintiff is eligible for continued enrollment, degree completion, and professional opportunities without disability-based restriction or adverse notation - the statement to be suitable for provision to prospective employers, academic programs, and professional references, delivered to Plaintiff within thirty (30) days of the Court's order, and, if ordered by the Court, acknowledging institutional failures in the handling of Plaintiff's disability, housing, and disciplinary matters; (viii) issuance of a separate written statement on Northeastern University letterhead, signed by a senior academic officer and addressed for use with academic institutions, employers, and funding bodies, confirming that Plaintiff is in good academic standing, that no disciplinary findings remain on her record, and

that any prior internal characterizations portraying her as dangerous or armed have been withdrawn as unfounded; (ix) implementation of a written non-retaliation and reasonable-accommodation plan specific to Plaintiff, ensuring she may complete her degree with a disability-appropriate course load, housing stability, and grading protections, overseen by a Northeastern administrator with no prior involvement in the events described in this Complaint; (x) full processing and resolution of insurance claim, including transmission of all outstanding claim documentation to the assigned carrier and payment of all covered expenses within thirty (30) days of the Court's order; and (xi) cessation of all retaliatory conduct against Plaintiff; (xii) a permanent injunction prohibiting Defendants, their officers, agents, employees, and contractors from (a) making, publishing, or repeating any false or misleading statement suggesting that Plaintiff posed a threat of violence, was "dangerous" or "armed," or engaged in misconduct related to the events described in this Complaint; (b) disclosing Plaintiff's medical, disability, disciplinary, immigration, or housing information to any third party, including vendors, campus recruiters, business partners, prospective employers, investors, and external academic collaborators, except as strictly required by law or by order of this Court; and (c) communicating with any third party about Plaintiff in a manner that is retaliatory or reasonably likely to interfere with her future educational or professional opportunities, including by characterizing this litigation as frivolous or defamatory.

vii. Return or replacement value of all personal property, personal and academic documents, and prescription medications removed from Plaintiff's dwelling at 144 State Street on January 14, 2026 without judicial process, at current replacement cost as established by Plaintiff's documentation;

viii. Restitution of the Alfond Scholarship principal certified on Plaintiff's I-20 and never disbursed, together with the excess private loan principal and interest Plaintiff was compelled to borrow

as a direct consequence of that non-disbursement, and all wrongful charges later reversed, with pre-judgment interest at the maximum rate permitted by law from the date of first non-disbursement;

ix. Attorneys' fees and costs, when available, pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 12205, 42 U.S.C. § 1988, 42 U.S.C. § 3613(c)(2), and 5 M.R.S. § 4614;

x. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

xi. Such other and further relief as this Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution.

Respectfully submitted,

JANE DOE

Plaintiff, Pro Se

Portland, ME

Date: March, 11, 2026