UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JANE DOE,<br><br>Plaintiff<br><br>v.<br><br>NORTHEASTERN UNIVERSITY, et al.,<br><br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:26-cv-00130-LEW |

**RECOMMENDED DECISION AFTER REVIEW OF PLAINTIFF'S SECOND AMENDED COMPLAINT**

Plaintiff alleges that Defendants—a university, two affiliated residential property companies, and twelve employees of the university and businesses—breached contracts, committed multiple torts against her, discriminated and retaliated against her based on a disability, and conspired to deprive her of her civil rights. (Complaint, ECF No. 1). With her complaint, Plaintiff filed an application to proceed without prepayment of fees, (Application, ECF No. 8), which application the Court granted. (Order, ECF No. 10.)

In accordance with the statute governing actions filed without the prepayment of fees, 28 U.S.C. § 1915(e)(2), I conducted a preliminary review of the complaint and recommended dismissal unless Plaintiff amended the complaint to address the deficiencies identified in the recommended decision. (Recommended Decision, ECF No. 13.) Plaintiff then filed multiple amendments. (First Amended Complaint, ECF No. 18; First Corrected

Amended Complaint, ECF No. 20; Second Amended Complaint, ECF No. 28.)[1] A preliminary review of Plaintiff's second amended complaint is appropriate.[2]

Following a review of Plaintiff's complaint, for the reasons explained below, I recommend the Court dismiss the matter.

## LEGAL STANDARD

28 U.S.C. § 1915 is designed to ensure meaningful access to the federal courts for individuals unable to pay the cost of bringing an action. When a party is proceeding without prepayment of fees, however, "the court shall dismiss the case at any time if the court determines," inter alia, that the action is "frivolous or malicious" or "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B). "Dismissals [under § 1915] are often made sua sponte prior to the issuance of process, so as to spare prospective defendants the inconvenience and expense of answering such complaints." *Neitzke v. Williams*, 490 U.S. 319, 324 (1989).

When considering whether a complaint states a claim for which relief may be granted, courts must assume the truth of all well-plead facts and give the plaintiff the

---

[1] In connection with the filing of her amended pleadings, Plaintiff file several motions. I grant Plaintiff's motion for leave to file a second corrected amended complaint (ECF No. 21), Plaintiff's motion to accept the second amended complaint (ECF No. 25), and Plaintiff's motion to seal the unredacted version of the second amended complaint (ECF No. 27). Plaintiff's initial and subsequent filings are extensive and require time to review and assess. The Court has reviewed and will continue to assess Plaintiff's filings in the normal course. The Court has many matters it must assess, and I discern no reason that Plaintiff's claim should be prioritized over other matters on the Court's docket. Accordingly, while I understand Plaintiff's desire to expedite the process, I deny Plaintiff's motions for expedited screening and related service of the second amended complaint (ECF Nos. 21, 26).

[2] Because I issue this recommended decision after review of the Plaintiff's amended pleading, I withdraw the prior recommended decision (ECF No. 13).

benefit of all reasonable inferences therefrom. *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011). A complaint fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A self-represented plaintiff is not exempt from this framework, but the court must construe his complaint 'liberally' and hold it 'to less stringent standards than formal pleadings drafted by lawyers.'" *Waterman v. White Interior Solutions*, No. 2:19-cv-00032-JDL, 2019 WL 5764661, at *2 (D. Me. Nov. 5, 2019) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). "This is not to say that pro se plaintiffs are not required to plead basic facts sufficient to state a claim." *Ferranti v. Moran*, 618 F.2d 888, 890 (1st Cir. 1980).

## FACTUAL ALLEGATIONS[3]

Plaintiff, a foreign national with a student visa, was admitted to an education program at Defendant Northeastern's (Northeastern) Roux Institute in Portland, Maine. (Second Amended Complaint ¶ 28.) According to Plaintiff, in connection with her application and enrollment, Northeastern represented that certain funds and support services would be operative when she arrived in the United States, but the funds were not available as Plaintiff expected. (*Id.* ¶ 28–29.) On January 8, 2024, a university official certified Plaintiff's immigration-related I-20 form, which form contained a financial section listing expected costs and certain funding. (*Id.*) The loan funds referenced on the I-20 form were not disbursed until much later—in October 4, 2024—nine months after

[3] The facts are derived from Plaintiff's latest amended complaint.

Plaintiff arrived. (*Id.* ¶ 29.) Because the student visa program did not permit outside employment, Plaintiff experienced financial hardship between January and October 2024, including food insecurity. (*Id.* ¶ 30.)

In March 2024, when two employee defendants (the Assistant Director of Financial Aid and the Director of Enrollment) met with Plaintiff, one of the employees pressured Plaintiff to secure additional external loan funding, and the same employee accused her of entering the United States illegally. (*Id.* ¶ 31.) The employee demanded that Plaintiff sign inaccurate financial attestations to be used for a credit application, but Plaintiff refused. (*Id.*)

Plaintiff asserts that one of the employee defendants (a lecturer at the Roux Institute) lacked the proper credentials to teach one of Plaintiff's courses in the spring 2024 semester, that in March 2024 the instructor told Plaintiff in front of another employee defendant (an academic advisor) that Plaintiff should "prepare to fail," that in April 2024 the instructor refused Plaintiff's request for an incomplete grade to submit assignments late and resubmit work for a higher grade, that the instructor refused to grade Plaintiff's work, and that the instructor assessed Plaintiff a failing grade. (*Id.* ¶ 32.) Plaintiff attempted to appeal the grading decisions, but the academic advisor did not intervene. (*Id.* ¶ 33.) In May 2024, the advisor encouraged Plaintiff to apply for repeat funding but refused to provide Plaintiff with an extension of time to complete the application, which refusal evidently caused Plaintiff to submit the application before she was fully ready. (*Id.*)

In July 2024, Defendant Annie Chuprevich (the Senior Director of Student Life and Housing) authorized a credit to Plaintiff's billing account corresponding to the cost of

spring and summer 2024 housing and tuition. (*Id.* ¶ 34.) Plaintiff evidently interprets the credit as a form of acknowledgement of wrongdoing. Plaintiff requested a campus transfer. (*Id.* ¶ 35.) In August 2024, Plaintiff requested and was approved for a cross-campus attendance arrangement wherein she would take classes in Boston during the Fall 2024 semester while remaining in student housing in Portland, Maine. (*Id.* ¶ 36.)

In September 2024, the university assigned Plaintiff to one bedroom of a two-bedroom apartment in a building located at 144 State Street, Portland, Maine, which was owned or operated by Defendant Redfern, LLC. (*Id.* ¶ 40.) A roommate was assigned to the other bedroom in the unit. (*Id.*) Plaintiff requested immediate transfer because she alleged that the single small non-operable window was below the natural light requirements under the city's code, the closet was too narrow to accommodate standard clothes hangers, and there was an insect infestation; the transfer request was denied. (*Id.*) In late September 2024, Plaintiff wrote to Defendant Chuprevich that she was experiencing significant stress from commuting to Boston, but no action was taken to support Plaintiff. (*Id.* ¶ 39.)

On December 2, 2024, Plaintiff collapsed in the staircase of the apartment building, sustaining what a neurologist later described as a moderately severe traumatic brain injury. (*Id.* ¶ 42.) Subsequent medical evaluations revealed measurable post-concussive cognitive deficits in processing speed, memory, executive function, sustained attention, and oculomotor impairment. (*Id.* ¶ 118.)

On December 8, 2024, Plaintiff wrote to university officials and the property management company about the fall and sought information about filing an insurance claim. (*Id.* ¶ 43.) Later that month, Plaintiff requested surveillance footage; one of the

property management companies denied the request citing a policy against sharing footage because it reveals the locations of security cameras. (*Id.* ¶ 46.)

On December 20, 2024, Plaintiff wrote to the university's Disability Access Services for permission to take an exam remotely or in a location closer to her Portland residence. (*Id.* ¶ 47.) When the disability office denied the request a few days later, Plaintiff traveled from Portland to Boston to sit for the examination despite mobility limitations. (*Id.*)

On January 21, 2025, Plaintiff emailed Defendant Chuprevich seeking to extend the duration of her student housing assignment for the spring 2025 semester because the proximity to the MaineHealth hospital (a 12-minute walk) would help her study, manage treatment, and minimize disruptions during the critical phase of recovery. (*Id.* at 49.)[4] Defendant Chuprevich responded ten days later advising that the request was under consideration. (*Id.*)

Plaintiff began coordinated neurological care at the nearest medical center on January 31, 2025. (*Id.* ¶ 48.) Plaintiff argues that she would have received better care earlier if the university provided resources and education on the local medical system. (*Id.*)

---

[4] Plaintiff never clearly explained why an extension was needed. She alleged elsewhere that the housing assignment was set to expire on December 31, 2024. (*Id.* ¶ 53.) According to the Roux Institute's website at the time, the university made twelve-month leases "available to students within the first year of their program," but because there was "high demand for limited units," the university was "not able to offer lease renewals." *Frequently Asked Questions*, Roux Institute, https://web.archive.org/web/20250119030308/https://roux.northeastern.edu/student-housing/. A year later, at some point between December 2025 and February 2026, the website changed to state that university housing was available for as long as a student is enrolled in a program in Portland, Maine. *Frequently Asked Questions*, Roux Institute, https://web.archive.org/web/20260212155300/https://roux.northeastern.edu/student-housing/.

On February 13, 2025, Plaintiff's roommate sent photographs of plastic cutlery to Defendant Barry (the Associate Director of Housing). (*Id.* ¶ 50.) Defendant Barry confirmed a housing transfer for the roommate on February 21, 2025. (*Id.*) On February 22 and 23, 2025, the roommate reported an incident involving plastic cutlery being used to unlock a bathroom door. (*Id.*) The roommate withdrew the complaint on February 28, 2025. (*Id.*) Despite the withdrawal, Defendant Barry filed a university disciplinary complaint against Plaintiff involving allegations of dangerous weapons, endangering behavior, and disorderly conduct. (*Id.*) The employee also forwarded the allegations to the property management company and other authorities. (*Id.*)

On February 28, 2025, Plaintiff emailed Defendant Chuprevich asking to switch to her former roommate's now-vacant room "to escape the habitability violations reported months earlier and transfer from her non-compliant, window-deficient room to an available light-filled room." (*Id.* ¶ 52.) On March 3, 2025, Plaintiff requested reduced housing fees under a university policy for unexpected medical expenses. (*Id.*)

On March 10, Defendants Barry and Chuprevich issued a move-out notice stating that the housing license expired on December 31, 2024, and that the April 30, 2025, move-out date was firm and would not be extended. (*Id.* ¶¶ 53, 54.) Defendant Chuprevich denied housing fee relief and asserted that Plaintiff was no longer a student at the Portland campus. (*Id.* ¶ 53.) On March 11, 2025, the Office of Student Conduct and Conflict Resolution advanced disciplinary charges against Plaintiff, evidently related to the incident with the former roommate. (*Id.*) Plaintiff argues that the timing of the negative actions is

suspect because they occurred just three weeks after Defendant Northeastern was designated as the insurer for Plaintiff's premises-injury claim. (*Id.*)

On April 28, 2025, citing the Americans with Disabilities Act and the Fair Housing Act, Plaintiff wrote to Defendant Chuprevich requesting a medical accommodation to extend her current housing accommodation beyond the April 30, 2025, vacate date. (*Id.* ¶ 54.) Defendant Chuprevich replied that this was the first time Plaintiff sought an extension beyond the earlier "courtesy extension" through April 30, 2025, that an extension would incur additional housing charges, and that she should make the request through the university's Disability Access Services office. (*Id.*)

On April 29, 2025, Plaintiff filed a housing discrimination complaint with Maine's civil rights agency. (*Id.* ¶ 55.) According to Plaintiff, university employees lifted prior obstacles and granted extensions and other requests after previously resisting or ignoring them. (*Id.*)

On August 7, 2025, another employee defendant issued findings in the student disciplinary case that Plaintiff was not responsible for violating the dangerous weapons policy, that Plaintiff was not responsible for violating the endangering behavior policy, and that there was insufficient information that Plaintiff had threatened the former roommate. (*Id.* ¶ 56.) Although Plaintiff asserts that she was cleared of "the serious charges," the employee required Plaintiff to complete a "living with a roommate" training module and placed a registration block to enforce the requirement. (*Id.*) On August 17, 2025, Plaintiff objected in writing to another employee defendant, but the employee refused to remove the requirement. (*Id.*)

On August 25, 2025, Plaintiff made the following accommodation requests for medical reasons and citing her treating neurologist at MaineHealth: (1) a 50% reduction in coursework, (2) academic pacing flexibility, (3) a stable university residence environment, and (4) deferral of procedural demands. (*Id.* ¶ 57.) The neurologist expected the accommodations to remain necessary for up to one year. (*Id.*) On September 12, 2025, another employee defendant (the Director of Disability Access Services) approved the accommodation request for a reduced course load but denied the request to remain in university-assigned housing. (*Id.* ¶ 58.) The employee determined that the asserted housing medical need was for housing in proximity to Plaintiff's medical providers, which the employee maintained could be achieved through off campus living arrangements. (*Id.*) On September 15, 2025, Plaintiff wrote to the employee objecting to the decisions, asserting that they caused her harm because she had continued commuting eighteen hours per week during the intervening period, and stating that she expected the university to approve the accommodation requests "exactly as [her] neurologist prescribed." (*Id.* ¶ 59.)

On September 16, 2025, Plaintiff withdrew from the state civil rights agency proceeding. (*Id.* ¶ 61.) Plaintiff maintains that the choice was not a concession on the merits but instead reflected a need to minimize non-essential cognitive and emotional demands. (*Id.*) According to Plaintiff, pressure and obstacles from university employees resumed after she abandoned the proceeding. (*Id.*) On October 27, 2025, Plaintiff received notice that Defendant Barry and a property management employee would conduct an inspection of the housing unit related to damage, maintenance and/or cleanliness. (*Id.* ¶ 62.) Plaintiff consented to inspection by a staff member from Defendant Redfern

Properties or another representative from the university's housing office but refused to consent to entry by Defendant Barry. (*Id.*) Plaintiff asserts that she characterized her refusal as a disability accommodation request because Defendant Barry's prior actions had allegedly caused harm to Plaintiff's health. (*Id.*) On October 28, 2025, a property manager conducted the inspection and documented no defects in the unit. (*Id.*)

On December 4, 2025, Plaintiff wrote to another employee defendant (the Senior Vice Chancellor for Student Life) demanding removal of the registration hold that was preventing her from enrolling in courses for the Spring 2026 semester. (*Id.* ¶ 64.) The employee directed Plaintiff to work with the Office of Conduct and Conflict Resolution. (*Id.*) On December 12, 2025, Plaintiff completed the required training module but stated that her participation in the training was "coerced under threat of academic exclusion, made under protest, with full reservation of rights." (*Id.*)

On December 15, 2025, Plaintiff submitted updated medical documentation from the same treating neurologist in support of a request for the same accommodations for the next academic term. (*Id.* ¶ 66.) Plaintiff also wrote to the university wellness coordinator and health services office requesting emergency housing stability as a medically necessary accommodation. (*Id.* ¶ 67.) The employee from the disability services office again approved the reduced course load but denied the request for an extension of her student housing assignment and deferral of procedural demands. (*Id.* ¶ 66.)

During extreme cold weather on December 19, 2025, Plaintiff reported to Portland Housing Safety that she was requesting an inspection for compliance with requirements related to light, ventilation, heat, and electricity because her unit had no heat for three days

and was experiencing intermittent disruption of electrical service. (*Id.* ¶ 68.) An employee defendant from Defendant Redfern wrote to Plaintiff on the same day noting that they had received a call from the City of Portland code enforcement office based on a complaint of no heat, that Defendant Redfern had no recorded errors from the unit within the claimed time period, and that the unit was currently heating between 70–71 degrees. (*Id.*)

Defendant Chuprevich wrote to Plaintiff that notice to vacate the housing unit was extended to January 2, 2026. (*Id.*) The property manager sent a tenancy termination notice enclosing a Maine Judicial Branch mediation package. (*Id.*) On January 2, 2026, Plaintiff sent to the property manager and several university employees a notice that they were parties to actions filed concerning her tenancy and the eviction notice. (*Id.* ¶ 69.)

On January 12, 2026, the property manager and Defendant Chuprevich arrived at Plaintiff's door and entered her apartment using a master key without her consent and without a court order. (*Id.* ¶ 70.) The property manager put her foot in the door to prevent Plaintiff from closing the door and asserted that this was not an eviction. (*Id.*) Less than an hour later, Plaintiff emailed Defendant Chuprevich and several other university offices a cease-and-desist letter, and Plaintiff reported the entry and a new heat shutoff complaint to Portland Code Enforcement. (*Id.* ¶¶ 70–71.) In the hours that followed, Portland Code Enforcement contacted Defendant Redfern and heat was restored. (*Id.* ¶ 70.)

On January 13, 2026, Plaintiff attended the first day of classes of the spring 2026 semester, and, upon returning to Portland that night, could not access the building using her key fob. (*Id.* ¶¶ 66, 73.) Plaintiff concluded that her key fob was deliberately deactivated to prevent her from accessing her unit. (*Id.* ¶ 73.) On January 14, 2026,

Plaintiff filmed Defendants Chuprevich, Barry, and the property manager removing Plaintiff's belongings from the unit over her objection. (*Id.*) Plaintiff asserts that she lost access to certain prescription medications. (*Id.*) On January 15, 2026, the Vice Chancellor wrote to Plaintiff that she had no entitlement to reside in student housing based on landlord tenant law, disability law, or otherwise. (*Id.* ¶ 76.)

Plaintiff initiated this federal lawsuit in March 2026. (Complaint, ECF No. 1.) Later in the same month, Defendant Northeastern imposed a financial registration bar. (Second Amended Complaint ¶ 78.) In April 2026, Plaintiff's private student loan lender declined to disburse further funds to Plaintiff. (*Id.*) Plaintiff was also diagnosed with hypopituitarism, which she asserts is causally linked to the traumatic brain injury. (*Id.* ¶ 79.) In May 2026, Defendant Northeastern transferred Plaintiff's unpaid account balance to a third-party collections servicer. (*Id.* ¶ 80.)

## Discussion

Plaintiff asserts two federal claims against the three entity defendants. (*Id.* at 50–58.) Plaintiff argues the university and housing entities failed to provide a reasonable accommodation for her disability after the December 2024 injury and retaliated against her for requesting accommodations in violation of the Fair Housing Act (FHA), Title III of the Americans with Disabilities Act (ADA), and § 504 of the Rehabilitation Act.[5] As

[5] Although the different disability discrimination statutes have somewhat different language, courts often address them together when more than one applies because the "standards are generally the same under all three statutes[.]" *Friedman v. Central Maine Power Co.*, No. 2:20-cv-00237-JDL, 2021 WL 1234638, at *2 (D. Me. Mar. 31, 2021).

explained below, there are several apparent obstacles to Plaintiff proceeding with the claims.

**A. Reasonable Accommodation Claim**

To state a reasonable modification/accommodation claim, a plaintiff must show: (1) the plaintiff is a person with a disability, (2) the defendant is covered by one of three statutes; (3) the defendant has a discriminatory policy or practice in effect; (4) the plaintiff requested a reasonable modification in that policy or practice which would have afforded the plaintiff access to the goods, services, or program; (5) that the modification was necessary to afford that access; and (6) that the defendant refused to modify the policy or practice. *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307–08 (1st Cir. 2003).

Regarding the first element, as alleged, the disability discrimination statutes apply to the organizational defendants. Similarly, the alleged facts would support a finding that the entities refused to modify certain policies or practices after Plaintiff made the requests. Plaintiff thus satisfied the sixth element, at least for some of the policies and practices during some portions of the times at issue in this case.

Regarding the second element, Plaintiff described generally an injury that is likely capable of causing at least a temporary disability in some cases. *See Mancini v. City of Providence by & through Lombardi*, 909 F.3d 32, 41 (1st Cir. 2018) (noting that "injuries can comprise impairments, even when their impact is only temporary"). Plaintiff includes in her pleading a conclusory legal allegation that she had impairments that substantially limit major life activities, but she provided few facts regarding the symptoms and impacts to render the proposed conclusion plausible. Plaintiff offers no explanation of how or the

degree to which her alleged impairments (post-concussive cognitive deficits in processing speed, memory, executive function, and attention) have impacted the major life activities she lists (learning, concentrating, processing information, sleeping, and caring for herself), nor is it obvious from the nature of the alleged injury. (Second Amended Complaint ¶¶ 117–18). For example, Plaintiff alleges that she had "severe bruising and limited mobility following the accident," (*Id.* ¶ 47), but she provided no explanation of the extent or nature of the alleged mobility limitations. Plaintiff also described mobility limitations and post-concussive limitations immediately following the injury, but she provided no account of how her mobility and neurological limitations changed or persisted over more than a year of recovery and treatment to permit an assessment of the subsequent/renewed requests for accommodations. *See Mancini*, 909 F.3d at 44 (noting that a plaintiff's burden on the "substantially limits major life activities" inquiry is "a relatively low bar" but "is not the same as no bar at all" and concluding that "[i]t does not suffice merely to allege in a wholly conclusory fashion, without any further details or supporting documentation, that an impairment substantially limits one's major life activities").

Even assuming the complaint satisfies the second element, a similar concern exists as to the third, fourth, and fifth elements. The absence of alleged facts regarding Plaintiff's condition and limitations precludes the requisite assessment of whether the organizational defendants had policies that effectively restricted access and whether the requested modifications were reasonable and necessary to provide equal access to the organizational defendants' programs. *See Jones v. Nationwide Life Insurance Co.*, 696 F.3d 78, 89 (1st

Cir. 2012) ("An accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability").

The following accommodation requests are alleged explicitly or otherwise discernible in the second amended complaint: (1) an April 2024 request for policy compliance regarding grading decisions, (2) a September 2024 request for a room transfer, (3) a December 2024 request for remote testing, (4) a January 2025 request for an extension of student housing, (5) a February 2025 room transfer request, (6) a March 2025, request for housing fee reduction, (6) an April 2025 request for an extension of student housing, (8) an August 2025 request for reduced coursework, (9) an August 2025 request for academic pacing flexibility, (10) an August 2025 request for an extension of student housing, (11) an August 2025 request for deferral of procedural demands, (12) an October 2025 request for an a different employee to conduct a housing inspection, (13) a December 2025 request for reduced coursework, (14) a December 2025 request for academic pacing flexibility, (15) a December 2025 request for an extension of student housing, and (16) a December 2025 request for deferral of procedural demands.[6]

The first and second requests cannot be construed as accommodations for a disability because the injury that caused the alleged impairments had not yet occurred when

[6] Plaintiff also argues that she "effectively requested" other steps and other relief, which she contends amounted to other accommodation requests. Plaintiff did not allege that she made other sufficiently specific and direct requests and that she explained to Defendants how they were reasonable and necessary because of her disability. Moreover, the other requests did not seek modifications of policies and practices to permit equal access as addressed by the disability discrimination statutes. Rather, the other arguments Plaintiff raises amount to assertions that Defendants should have done more to assist her, or the arguments raise other legal claims, such as negligence, premises liability, or insurance trade practices claims. (*See, e.g.*, Second Amended Complaint ¶¶ 88, 89.)

the requests were made. Plaintiff's repeated focus on building-code-related objections to the bedroom and the window size undermines the plausibility of the proposed inference that the fifth request (seeking the same room transfer as the first request) was disability-related. Even if the fifth request was truly disability-related, there is no authority requiring a similar window size accommodation, and Plaintiff did not offer enough facts to support a plausible inference that it was necessary to provide equal access to Defendants' programs for Plaintiff to have a window that was larger by an unspecified margin.

The fourth, seventh, eighth, tenth, twelfth, and thirteenth requests were explicitly granted or essentially or implicitly granted because Plaintiff received the requested relief. Plaintiff failed to explain adequately the ninth, eleventh, fourteenth, and sixteenth requests. She mentioned the requests for "academic flexibility," but she did not address them further or assert whether the requests were denied or granted. Similarly, Plaintiff provided no information for Defendants or a factfinder to understand precisely what was meant by "deferral of procedural demands." To the extent that Plaintiff was asking to remove all deadlines, forms, and other measures that all large bureaucracies use to operate, there is no authority requiring such a broad accommodation. To the extent that Plaintiff was asking for something less, it is not defined adequately in the second amended complaint. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255–56 (11th Cir. 2001) ("The plaintiff bears the burden of identifying an accommodation, and of demonstrating that the accommodation allows [equal access]").

The third request—remote testing not on the Boston campus—similarly fails because the complaint lacks any facts to support an inference that the accommodation was

necessary or reasonable. Plaintiff did not specify whether she requested the accommodation because of her mobility-related injuries (e.g. bruising) or whether she asserts the accommodation was necessary because of her symptoms from the traumatic brain injury. If the former, Plaintiff did not allege facts to explain why she had sufficient mobility to take a proctored exam in her preferred location but not the ordinary location. She also did not explain why the cognitive demands of the commute were greater or even significant compared to the examination she sought to take. Furthermore, courts have rejected similar claims for remote academic attendance as unnecessary or unreasonable because it would be an undue burden or alter the nature of educational program, on which issues courts typically extend significant deference to educational institutions on academic matters. *See Gati v. Western Kentucky University*, 762 F. App'x 246, 251 (6th Cir. 2019); *see also, Wynne v. Tufts University School of Medicine*, 932 F.2d 19, 25–26 (1st Cir. 1991) (discussing deference to educational institutions on programmatic matters).

The second amended complaint also fails to state a claim regarding the sixth request, a housing fee reduction. Such claims are insufficient when they are based on an alleged failure to waive generally applicable fees and when the alleged need stems from a person's financial hardship rather than a special requirement of the person's impairment. *See Pownall El v. S. Realty*, No. 24-CV-6450 (LTS), 2024 WL 4635344, at *4 (S.D.N.Y. Oct. 28, 2024). Plaintiff evidently sought to avoid ordinary housing costs based on financial insecurity from multiple causes, including medical expenses. That need, however, is shared by many people with impairments and without impairments.

Plaintiff does not raise circumstances within the narrow category of cases where a fee waiver can be reasonable, necessary, and disability-related because a generally applicable additional expense is attached to a choice for nondisabled individuals while the disabled individual has no choice but to incur the additional expense because of the individual's impairment. *See Birdwell v. AvalonBay Communities, Inc.*, 742 F. Supp. 3d 1024, 1038 (N.D. Cal. 2024); *CNY Fair Housing, Inc. v. Welltower Inc.*, 588 F. Supp. 3d 282, 297 (N.D.N.Y. 2022). The allegations suggest that the housing fees are applicable to all students in university housing and are not unlawful surcharges for services required by the ADA. *See generally,* 28 C.F.R. § 36.301(c); *Robishaw v. Providence Probate Court*, 206 F. Supp. 723, 730-31 (D. R.I. 2016); *Dare v. California*, 191 F.3d 1167, 1171 (9th Cir. 1999).

Finally, there are insufficient facts to support a finding that Plaintiff's fifteenth request—another extension of her university housing assignment—was reasonable and necessary. By the time of the request, Plaintiff had evidently already received approximately one year of extended residency in the student housing unit since her first request for an extension. Plaintiff provided no information regarding the nature of her impairments in December 2025 that would support a finding of a continued need for "housing stability" in the second year of extensions. Plaintiff argues that she needs to live close to her medical provider and that her neurologist recommended that she have stable housing, but she did not include any facts about her symptoms to allow a factfinder to assess the alleged need to remain in student housing in particular, and she offered no explanation why she could not continue attending the university while obtaining other

nearby stable housing. *See Colon-Jimenez v. GR Management Corp.*, 218 F. App'x 2, 3 (1st Cir. 2007) ("beyond asserting that appellants needed a quiet apartment in order to protect their mental health, it was never made clear precisely how the transfer request was linked to or made necessary by appellants' disabilities"); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) ("[a defendant] "is not obligated to provide [a plaintiff] the accommodation [s]he requests or prefers, [a defendant] need only provide some reasonable accommodation").

**B. Disability Retaliation Claim**

To proceed on a disability retaliation claim under the familiar burden shifting approach, (1) a plaintiff must show that he or she engaged in protected conduct, he or she was subjected to an adverse action by the defendant, and there was a causal connection between the protected conduct and the adverse action; (2) the burden then shifts to the defendant to articulate a legitimate, non-retaliatory explanation for the adverse action; and (3) the burden then shifts back to the plaintiff to show that the proffered legitimate explanation is pretextual, meaning that the defendant was motivated by a retaliatory animus. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012). The First Circuit instructs that the prima facie case is not "a rigid pleading standard," *Rae v. Woburn Public Schools*, 113 F.4th 86, 109 (1st Cir. 2024) (quotation marks omitted), but the burden shifting framework and the prima facie case "may be used as a prism to shed light upon the plausibility of the claim." *Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 54 (1st Cir. 2013).

Regarding the protected conduct element, Plaintiff cites her accommodation requests. Courts have held that reasonable disability-related requests for policy modifications can constitute a protected activity for purposes of the disability discrimination statutes. *Akerson v. Pritzker*, No. CV 12-10240-PBS, 2021 WL 2295522, at *8 (D. Mass. June 4, 2021). The investigation of misconduct, the requirement to attend a training session on living with a roommate, the alleged failure to voluntarily take affirmative steps to assist Plaintiff, and the denials of her requests for fee waivers and other accommodations would not satisfy the adverse action requirement, s*ee Shervin v. Partners Healthcare System, Inc.*, 804 F.3d 23, 50 (1st Cir. 2015) (noting that adverse actions occur when there is significant conduct sufficient to deter a reasonable person from reporting discrimination); *Mullin v. Secretary, U.S. Department of Veterans Affairs*, 162 F.4th 1296, 1315 (11th Cir. 2025) (reasoning that if denial of accommodation requests were adverse action, there would be no difference between retaliation claims and reasonable modification claims), but at this stage of the proceeding, the alleged lockout from her apartment is likely sufficient to satisfy the adverse action element.

Plaintiff, however, has not alleged sufficient facts to support a finding that her accommodation requests were the but-for cause of the lockout. Plaintiff evidently relies on the temporal relationship between the requests and the lockout. In some cases, the temporal proximity between protected conduct and adverse action can support a plausible inference of causality, but it must be very close. *Calero-Cerezo v. U.S. Department of Justice*, 355 F.3d 6, 25 (1st Cir. 2004). Indeed, even close proximity can be insufficient "particularly if the larger picture undercuts any claim of causation." *Cordero Ayala v.*

*United States Postal Service*, No. CV 20-1239 (MEL), 2024 WL 2199005, at *12 (D.P.R. Mar. 27, 2024) (quoting *Wright v. CompUSA, Inc.*, 352 F.3d 472, 478 (1st Cir. 2003) (nested quotation marks omitted).

Here, the timing alleged in the second amended complaint would not support an inference that the lockout was motivated by Plaintiff's requests for accommodations. Plaintiff alleges that much of Defendants' improper conduct occurred up to a year before she experienced any disability. Furthermore, she made many requests beginning in April 2024, but the alleged lockout did not occur until January 2026. Even if the temporal relationship analysis is limited to an alleged request made in December 2025, Plaintiff's other allegations undermine any inference that might be drawn from the temporal relationship between that request or any other subset of the accommodation requests and the lockout. For example, Defendants explicitly or effectively granted several of her requests, including an extension of the student housing assignment for the spring 2025 semester (which was the most prominent accommodation request identified in the complaint), and her requests for a reduced course load.

Some of Plaintiff's other assertions regarding the causes and motives for Defendants' actions also undermine any suggestion that a retaliatory motive may permissibly be inferred based on the temporal relationship. For instance, Plaintiff repeatedly alleges that university officials took adverse actions against her because of her premises liability/insurance claim rather than because she made disability requests. Plaintiff also alleges a closer temporal proximity between her complaints to city code enforcement and the lockout, but while complaints of violations of state laws or local

ordinances could perhaps be protected under state law, they are not considered bases for an action under the FHA. *See Kummerow v. Ohawcha.org*, No. 21-CV-635-WMC, 2022 WL 873599, at *3 (W.D. Wis. Mar. 24, 2022) ("the [FHA] does not authorize plaintiff to sue defendants in federal court for claims related to the habitability of the . . . apartment. Instead, landlord-tenant law is traditionally the province of the states, meaning that plaintiff *may* have a remedy in state court, or in a state or federal administrative proceeding, concerning the conditions of his dwelling, but not in federal court") (citations omitted) (emphasis in original); *Atterbury v. Sanchez*, No. CV 11-4932 SI, 2012 WL 3638571, at *5 (N.D. Cal. Aug. 22, 2012) ("A landlord's actions that are based on a tenant's complaints" about property conditions "are not actionable as discrimination under the FHA").

In sum, even considering all well-pled allegations and drawing all reasonable inferences in Plaintiff's favor, Plaintiff has failed to allege facts to support a plausible inference of retaliatory motive.[7] Plaintiff, therefore, has not alleged an actionable disability retaliation claim.

---

[7] Even if the Court were to assume that other alleged adverse actions were significant enough in isolation or in combination to be legally sufficient, such as the requirement in August 2025 (after the investigation of the incident with Plaintiff's former roommate) that Plaintiff attend a training module on living with a roommate, the analysis is not materially different. Ultimately, the only asserted facts to support the alleged retaliatory motive is a proposed correlation between the timing of her accommodation requests and the adverse actions, but based on Plaintiff's allegations, the correlation is insufficient to plausibly infer a retaliatory motive for the actions Plaintiff cites. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief") (quotation marks omitted).

### C. State Law Claims

Plaintiff asserts fourteen state law contract, quasi-contract, and tort law claims against the three entity defendants and the twelve employee defendants. Because Plaintiff has not alleged an actionable federal claim, the Court should not exercise supplemental jurisdiction over the state law claims. *See Rodriguez v. Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims").[8]

## CONCLUSION

After a review of Plaintiff's complaint in accordance with 28 U.S.C. § 1915, for the reasons explained above, I recommend the Court dismiss the matter.

## NOTICE

> A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.
>
> Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 31st day of August, 2026.

---

[8] I make no determination as to whether Plaintiff has alleged an actionable state law claim. That determination would be made by the state court if Plaintiff files a state court action.